Karen SPRINGER, Petitioner,

v.

CITY AND COUNTY OF DENVER,
Respondent.

No. 99SC543.

Supreme Court of Colorado,
En Banc.

Nov. 14, 2000.

Rossi, Cox, Kiker & Inderwish, P.C., John J. Rossi, John H. Inderwish, Janet S. Drake, Aurora, CO and Haddon, Morgan & Foreman, P.C., Norman R. Mueller, Rachel A. Bellis, Denver, CO, Attorneys for Petitioner.

J. Wallace Wortham, Jr., City Attorney, Geoffrey S. Wasson, Assistant City Attorney, Stan M. Sharoff, Assistant City Attorney, Denver, CO, Attorneys for Respondent.

Hoffman Reilly Pozner & Williamson, Wendy Fisher, Julie M. Williamson, Denver, CO, Attorneys for Amicus Curiae The Colorado Trial Lawyers Association.

Ken Salazar, Attorney General, Friedrick C. Haines, Assistant Attorney General, Litigation Section, Denver, CO, Attorneys for Amicus Curiae State of Colorado.

Justice HOBBS delivered the Opinion of the Court.

The Colorado Governmental Immunity Act (CGIA) waives the defense of governmental immunity in an action for injuries resulting from a dangerous physical condition of any public building arising from its construction or maintenance. *See* § 24–10–106(1)(c), 7

C.R.S. (2000). We granted certiorari to review the court of appeals' decision in *Springer v. City & County of Denver*, 990 P.2d 1092 (Colo.App.1999) to determine whether petitioner Karen Springer (Springer) can maintain her negligence action against the City and County of Denver (the City) in light of the CGIA.[1] We hold that a public entity does not have governmental immunity when it constructs a public building through the services of an independent contractor and a dangerous condition arises from that construction. We further hold that when a public entity provides a public building for public use, it owes a nondelegable duty to protect invitees under Colorado's premises liability statute from an unreasonable risk to their health and safety due to a negligent act or omission in constructing or maintaining the facility.

## I.

On December 30, 1995, Springer fell from her wheelchair as she attempted to enter the Temple Buell Theater (Theater) for a performance. The wheelchair abruptly stopped upon hitting a threshold plate at the foot of the Theater entrance, thrusting her to the floor. The threshold plate protruded approximately one inch above the surrounding floor.

The Theater is a public facility, part of the Denver Performing Arts Complex (Complex), that the City caused to be constructed, owns, operates, and maintains. The City renovated the Complex and built the Theater in the early 1990s. The City employed the services of an independent contractor, PCL Construction Services, Inc. (PCL), to construct the Theater. Architectural plans for the Theater called for a one-half-inch threshold at the base of the entrance. However, from the time the Theater opened in October 1991 to the time of Springer's fall in December 1995, the threshold plate protruded at approximately twice that height.

Springer brought suit against the City (1) alleging negligence in failing to construct, inspect, and maintain the threshold in a nondangerous condition, and (2) seeking compensation for her injuries resulting from her fall. She asserted that the City was vicariously liable for the negligence of PCL and its subcontractors in negligently constructing the threshold plate as part of the building. The City responded with a motion to dismiss on the pleadings under C.R.C.P. 12(b)(1), claiming that it was immune from suit under the CGIA.

The trial court denied the City's motion, finding that the protruding threshold plate constituted a dangerous condition of a public building, an exception to governmental immunity under section 24–10–106(1)(c). The trial court determined that the threshold plate was "constructed" by the City within the meaning of section 24–10–103(1), 7 C.R.S. (2000), notwithstanding the role of PCL as an independent contractor to the City. The court noted that to decide otherwise would render governmental entities "immune from liability for dangerous conditions simply because the act of construction was delegated to a general contractor." The trial court further determined that the defect in the threshold plate did not result solely from design, but rather was due to faulty construction or maintenance, and that, under either scenario, the City did not have immunity from suit.

---

1. We granted certiorari on the following issues:

    (1) Whether governmental immunity is waived, or whether the city is immune from tort claims that are based upon a dangerous condition of a public facility, when the condition is proximately caused by the negligent acts and omissions of the independent contractors the city hired to substantially remodel the facility.

    (2) Whether the city, as owner of a public facility, owes a non-delegable duty to protect members of the public whom it invites to enter and use the facility from dangerous conditions arising out of renovations or construction therein, or is the city's duty to invitees avoided by the act of hiring an independent contractor to renovate the facility.

    (3) Whether governmental immunity is waived if city inspectors fail to inspect for, or negligently fail to detect upon inspection, a dangerous condition proximately caused in the construction of a city-owned and city-operated facility.

    (4) Whether a city owes a duty to its invitees to inspect the construction of its public facilities to assure that they are free of structural defects and in safe condition for those invitees.

The City appealed, and the court of appeals reversed and remanded for further proceedings related to maintenance only. The court of appeals concluded that governmental immunity existed for construction, despite section 24–10–106(1)(c), for two reasons. First, the court of appeals concluded that the waiver under section 24–10–106(1)(c) applies only for the alleged negligent acts or omissions of city employees, not of independent contractors and subcontractors. *See Springer*, 990 P.2d at 1096. Second, the court determined that, even if knowledge of a faulty condition could be imputed to the City, such knowledge was insufficient to constitute waiver of governmental immunity. *See id.* at 1097.

We begin our immunity analysis with a review of the CGIA, its waiver provisions, and the appropriate standard of review. We then determine whether a public entity is excused from liability because it hired an independent contractor to construct the building for it. Finally, we consider the scope of a public entity's liability for a dangerous condition of a public building.

## II.

We hold that a governmental entity is liable for the dangerous condition of a public building constructed by the entity through the services of an independent contractor, and that premises liability applies under Colorado's statute in regard thereto.

### A.

### The Colorado Governmental Immunity Act

#### 1. Interpretation of the Act

In 1971, we decided a trilogy of cases, fundamentally altering the law of governmental immunity in Colorado.[2] *See Evans v. Board of County Comm'rs*, 174 Colo. 97, 482 P.2d 968 (1971); *Flournoy v. School Dist. No. 1*, 174 Colo. 110, 482 P.2d 966 (1971); *Proffitt v. State*, 174 Colo. 113, 482 P.2d 965 (1971). These three decisions abrogated Colorado's common law of governmental immunity. They also recognized that the General Assembly could reestablish governmental immunity by statute, if it desired. *See Evans*, 174 Colo. at 105, 482 P.2d at 972.

The General Assembly responded by enacting the CGIA. *See* ch. 323, sec. 1, §§ 130–11–1 to 17, 1971 Colo. Sess. Laws 1204, 1204–11. The CGIA establishes governmental immunity from suit against public entities and their employees in tort cases, but then waives immunity under certain circumstances and also provides exceptions to certain waivers. *See* § 24–10–106.

Because governmental immunity under the CGIA derogates Colorado's common law, we strictly construe the statute's immunity provisions. *See Bertrand v. Board of County Comm'rs*, 872 P.2d 223, 227 (Colo. 1994). As a logical corollary, we broadly construe the CGIA provisions that waive immunity in the interest of compensating victims of governmental negligence. *See Corsentino v. Cordova*, 4 P.3d 1082, 1086 (Colo. 2000); *Walton v. State*, 968 P.2d 636, 643 (Colo.1998).

#### 2. Standard of Review

Governmental immunity raises a jurisdictional issue. *See Walton*, 968 P.2d at 643; *Swieckowski v. City of Fort Collins*, 934 P.2d 1380, 1383–84 (Colo.1997). When the jurisdictional issue involves a factual dispute, a reviewing court employs the clearly erroneous standard of review in considering the trial court's findings of jurisdictional fact. *See Walton*, 968 P.2d at 643. However, if the alleged facts are undisputed and the issue is purely one of law, the appellate court reviews the jurisdictional matter de novo. *See Corsentino*, 4 P.3d at 1087; *Swieckowski*, 934 P.2d at 1384. Here, we review the trial court's ruling de novo because the issue of immunity when a public entity uses an inde-

---

**2.** Our common law decisions used the term "sovereign immunity" to denote immunity claimed by the State of Colorado, and "governmental immunity" to refer to immunity claims by its political subdivisions. *See Evans v. Board of County Comm'rs*, 174 Colo. 97, 102, 482 P.2d 968, 970 (1971). To maintain consistency with our recent opinions, *see Corsentino v. Cordova*, 4 P.3d 1082 (Colo.2000); *Walton v. State*, 968 P.2d 636 (Colo. 1998), we utilize the generic term "governmental immunity" to include both the state and its political subdivisions.

pendent contractor to construct its building is a legal question.

### 3. Dangerous Condition of a Public Building

■■■ In construing the immunity, waiver, and exception to waiver provisions of the CGIA, we give effect to the intent of the legislature. *See Bertrand,* 872 P.2d at 228. We look to the language of the statute, giving words their plain and ordinary meaning. *See id.* If the plain language of the statute demonstrates a clear legislative intent, we look no further in conducting our analysis. *See Jones v. Cox,* 828 P.2d 218, 221 (Colo. 1992).

Section 24–10–106(1) of the CGIA provides:

A public entity shall be immune from liability in all claims for injury which lie in tort or could lie in tort regardless of whether that may be the type of action or the form of relief chosen by the claimant except as provided otherwise in this section. Sovereign immunity is waived by a public entity in an action for injuries resulting from:

. . .

(c) A dangerous condition of any public building.

Cities and counties are within the definition of "public entity." *See* § 24–10–103(5). By its plain language, section 24–10–106(1)(c) provides the City with immunity from liability in all claims for injury, which lie in tort or could lie in tort, but the statute waives immunity in actions for injuries resulting from a dangerous condition of any public building. Whether the City enjoys immunity in this case depends on whether the protruding threshold plate that caused Springer's injury constituted a "dangerous condition" within the meaning of the statute.

Section 24–10–103(1) defines "dangerous condition" as:

*[A] physical condition of a facility or the use thereof which constitutes an unreasonable risk to the health or safety of the public, which is known to exist or which in the exercise of reasonable care should have been known to exist and which condition is proximately caused by the negligent act or omission of the public entity in constructing or maintaining such facility. Maintenance does not include any duty to upgrade, modernize, modify, or improve the design or construction of a facility. For the purposes of this subsection (1), a dangerous condition should have been known to exist if it is established that the condition had existed for such a period of time and was of such a nature that, in the exercise of reasonable care, such condition and its dangerous character should have been discovered. A dangerous condition shall not exist solely because the design of any facility is inadequate.*

(Emphasis added.)

■■■ We have construed this definition to mean that the waiver of immunity applies under section 24–10–106(1)(c) if the injuries occurred as a result of: (1) the physical condition of the public facility or the use thereof; (2) which constitutes an unreasonable risk to the health or safety of the public; (3) which is known to exist or should have been known to exist in the exercise of reasonable care; and (4) which condition is proximately caused by the negligent act or omission of the public entity in constructing or maintaining the facility. *See Walton,* 968 P.2d at 644. Additionally, the dangerous condition must be associated with construction or maintenance, not solely design. *See id.*

■■■ Taking the allegations in the complaint as true for the purposes of the jurisdictional determination, we are satisfied that the first three elements for immunity waiver enumerated in *Walton* exist in this case. The jurisdictional facts are that an accident occurred because of a dangerous physical condition of the City's building which created an unreasonable risk to the health and safety of members of the public using the building. The threshold plate protruded from the floor at a height approximately twice that called for in the building plans, unreasonably increasing the likelihood of an accident. The threshold plate remained at that height for over four years; the City knew or should have known of this

unsafe condition in the exercise of reasonable care.

The primary dispute in this case concerns the fourth element of the *Walton* test: whether the physical condition was proximately caused by a negligent act or omission by the City in constructing or maintaining the Theater. The City argues that it did not "construct" the Theater within the meaning of section 24–10–103(1), because an independent contractor, not City employees, constructed the building. The explicit exclusion of independent contractors from the definition of "public employee" in the CGIA, the City asserts, means that a public entity is not liable when an independent contractor constructs a public building. We disagree.

As an initial matter, we read the disjunctive "or" in the phrase "constructing or maintaining" in section 24–10–103(1) to mean that *either* negligent construction *or* negligent maintenance of a public facility is sufficient to satisfy the fourth prong of the *Walton* test. Therefore, if the dangerous physical condition was proximately caused by the City's negligent construction or negligent maintenance, the statute's waiver of immunity applies.

### ☛ a. Construction of the Theater

We turn first to whether the City "constructed" the Theater when it employed the services of an independent contractor. The City argues, and the court of appeals agreed, that public entities are only liable for the acts or omissions of their own employees. The City bases this in part on the definition of "public employee," which excludes independent contractors.[3] The City also points to three unrelated provisions of the CGIA which refer to "public employees." The City first cites section 24–10–105. That section provides, in pertinent part:

No public entity shall be liable for such actions [that lie or could lie in tort] except as provided in this article, and no public employee shall be liable for injuries arising out of an act or omission occurring during the performance of his duties and within the scope of his employment, unless such act or omission was willful and wanton, except as provided in this article.

§ 24–10–105, 7 C.R.S. (2000). The court of appeals read this section to mean that "a public entity is immune from liability for all claims that lie or could lie in tort which arise out of injuries sustained from acts or omissions of its employees that occurred during the performance of the employee's duties and within the scope of the employee's employment." *Springer*, 990 P.2d at 1095.

The court of appeals' reading contravenes the text and context of section 24–10–105. Two different principles are at work in this section: first, a public entity enjoys governmental immunity unless the CGIA waives immunity; and second, a public employee enjoys immunity unless the CGIA waives immunity or the employee's act or omission is willful and wanton. These are separate concepts concerning the necessary and sufficient conditions for waiver of immunity, one discussing the scope of immunity for public entities, and the other focusing on the scope of immunity for public employees. These provisions are not tied to each other such that the public entity's immunity waiver depends solely on the actions or omissions of its employees. The exclusion of independent contractors from the definition of "public employee" means that an independent contractor cannot, under any circumstances, gain immunity by reason of the CGIA's provisions, not that a public entity has immunity when it constructs a public building through the services of an independent contractor.[4]

The other sections cited by the City are similarly inapposite. Section 24–10–106(3)

---

3. The CGIA defines "public employee" to include "an officer, employee, servant, or authorized volunteer of the public entity, whether or not compensated, elected, or appointed, but does not include an independent contractor or any person who is sentenced to participate in any type of useful public service." § 24–10–103(4)(a), 7 C.R.S. (2000).

4. Even if the public entity is liable, the CGIA sets the maximum recovery for any injury to one person in any single occurrence at $150,000. *See* § 24–10–114(1)(a), 7 C.R.S. (2000). To provide recourse in the event of liability, the City may include an indemnification provision in its contracts with independent contractors.

provides that when a public employee is personally immune from liability for an act, the public entity shall likewise be immune. *See* § 24–10–106(3), 7 C.R.S. (2000). Section 24–10–118 outlines procedures for actions against public employees. *See* § 24–10–118, 7 C.R.S. (2000). Neither provision conditions public entity liability only on an employee's liability. Indeed, we discover no provision in the CGIA that conditions waiver of governmental immunity for public entities exclusively on the acts or omissions of public employees.

Nor do we find support elsewhere in the text of the CGIA for the proposition that a public entity is not liable for negligent acts or omissions attributable to it by the negligence of its independent contractor. Governmental immunity statutes in other jurisdictions expressly condition or waive a public entity's vicarious liability on acts or omissions of an independent contractor. *Cf.* Cal. Gov't Code § 815.4 (Deering 2000) (waiving a public entity's immunity for injuries proximately caused by the tortious act or omission of an independent contractor); 28 U.S.C. § 2671 (2000) (United States' immunity from suit not waived as to any liability for acts or omissions of an independent contractor); *see also United States v. Orleans*, 425 U.S. 807, 813–14, 96 S.Ct. 1971, 1975–76, 48 L.Ed.2d 390, 397–98 (1976) (discussing 28 U.S.C. § 2671). By contrast, in the context of a dangerous condition of a public building, the CGIA makes no mention of any party except the public entity.

Because the language of sections 24–10–103(1) and 24–10–106(1)(c) does not address specifically the public entity's liability for or immunity from negligence of its independent contractor, we must turn to other means of statutory construction. We examine the object sought to be attained by the statute, the consequences of a particular construction, and the statute's legislative purpose. *See* § 2–4–203(1)(a), (e) & (g), 1 C.R.S. (2000).

We thus turn to an analysis of the CGIA's waiver provisions, in order to ascertain their governing principles. If we can determine the underlying rationale for waiving immunity in certain circumstances, we can assess whether that rationale is consistent with the waiver of immunity for acts or omissions of independent contractors attributable to the City.

We begin by examining the subsections of section 24–10–106(1) that address dangerous conditions.[5] In each such subsection, a public entity lacks immunity, not because it necessarily *causes* a dangerous condition, but because it is in a position to discover and correct the condition. Governmental immunity waiver applies, for example, when a public entity fails to realign a stop sign or yield sign that reassigns the right-of-way at an intersection and creates a dangerous condition, even when the sign was turned without the entity's authorization. *See* § 24–10–106(1)(d)(II). Waiver also applies when a public entity, given reasonable notice and time to act, fails to clear dangerous snow and ice from public walkways, *see* § 24–10–106(1)(d)(III), or from public highways, roads, and streets, *see* § 24–10–106(1)(d)(I). The underlying principle operable in these waiver provisions is that a public entity may proximately cause a condition not only by affirmatively creating it, but also by its omission in failing to reasonably discover and correct the unsafe condition. Because the identical term—"dangerous condition"—is used in these subparagraphs and in section 24–10–106(1)(c), logic dictates that we apply the identical principle to the waiver for a dangerous condition of a public building. Use of a public building that has a dangerous condition arising from construction or maintenance, and an injury resulting therefrom, is the linchpin for this immunity waiver. *See* § 24–10–103(1); *Walton*, 968 P.2d at 645.

We also consider the consequences of alternate constructions. To hold that a public entity retains immunity whenever an independent contractor constructs the building under contract would nullify the essential purpose and effect of the waiver of immunity. Under this reading of the statute, immunity waiver would seldom, if ever, apply under section 24–10–106(1)(c). A public entity

---

**5.** Section 24–10–106(1) contains two main types of waivers: those based upon the operation of a public transport or facility, *see* § 24–10–106(1)(a), (b) & (f), and those based on the existence of a dangerous condition in a public area, *see* § 24–10–106(1)(c), (d) & (e).

could simply hire an independent contractor for any and all public works projects[6] and escape answering for injuries to citizens using its buildings. The result would be to eliminate the "dangerous condition of a public building" waiver from practical application, a result the General Assembly did not intend in view of its choice of waiver of immunity language.

This reading of the General Assembly's intent is consistent with longstanding principles of tort liability. Section 422 of the Restatement (Second) of Torts (Restatement) provides that a landowner who entrusts an independent contractor with construction, repair, or other work on the land is subject to the same liability to others for physical harm caused by an unsafe condition of the structure, as if the landowner had done the work. The landowner's liability exists if the landowner retains possession of the land while the work is being done or once the landowner resumes possession of the land upon completion of the work.[7] See Restatement (Second) of Torts § 422 (1965). The principles contained in the Restatement have existed in the common law for more than a century. See, e.g., Connolly v. Des Moines Inv. Co., 130 Iowa 633, 634, 105 N.W. 400, 401 (1905); Wilkinson v. Detroit Steel & Spring Works, 73 Mich. 405, 416–17, 41 N.W. 490, 494 (1889). Section 422 does not, however, posit landowner liability for the period the landowner vacates the property for construction purposes or otherwise turns possession over to the independent contractor for construction activities. This is also consistent with past determinations in the case law. See Thrasher v. Gerken, 309 N.W.2d 488, 489 (Iowa 1981); Csaranko v. Robilt, Inc., 93 N.J.Super. 428, 433, 226 A.2d 43, 46 (1967).

The public policy behind section 422 of the Restatement is consistent with the rationale

of the waiver of immunity provisions of section 24–10–106; namely, that a landowner is liable for dangerous conditions of the property whenever the landowner is in a position to discover and correct these conditions—here, where those conditions are associated with construction or maintenance. Where the rationales underlying related legal provisions are consistent, the application of the provisions should likewise be consistent. We therefore hold that a public entity constructs a building within the definition of "dangerous condition" in section 24–10–103(1) even though it hires an independent contractor to perform the work for it.

### b. Maintenance of the Theater

The waiver also applies if the City's negligent act or omission in maintaining the Theater proximately caused the dangerous condition. In Swieckowski, 934 P.2d at 1385, we held that the word "maintain" in section 24–10–103(1) means to keep a facility in the same general state of being, repair, or efficiency as initially constructed. Consequently, the waiver applies if the public entity allowed the condition of the building to fall from the general state of being, repair, or efficiency at which the facility was originally built. Although the public entity has no duty under "maintenance" to upgrade the construction of the facility, see § 24–10–103(1), this does not excuse a dangerous physical condition resulting from the building's construction.

This analysis suggests that a trial court need not, for the purposes of keeping jurisdiction, conduct a maintenance inquiry if the dangerous condition was present as a result of construction. Either or both supports jurisdiction. In this case, the parties agree for jurisdictional purposes that the unsafe

---

6. The City admitted at oral argument that nearly all of its public works projects are performed by independent contractors.

7. Section 422 states:
   **§ 422. Work on Buildings and Other Structures on Land**
   A possessor of land who entrusts to an independent contractor construction, repair, or other work on the land, or on a building or other structure upon it, is subject to the same

liability as though he had retained the work in his own hands to others on or outside the land for physical harm caused to them by the unsafe condition of the structure
   (a) while the possessor has retained possession of the land during the progress of the work, or
   (b) after he has resumed possession of the land upon its completion.
   Restatement (Second) of Torts § 422 (1965).

condition of the threshold plate resulted from construction.[8] This is enough to satisfy the fourth prong of the *Walton* test, and we need not inquire further into maintenance to sustain the trial court's jurisdictional determination. The court of appeals erred in restricting the suit to a negligent maintenance theory.

Because all four prongs of the *Walton* test exist here, we conclude that the protruding threshold plate which precipitated Springer's injury constituted a "dangerous condition of a public building" within the meaning of section 24–10–103(1) for jurisdictional purposes. *See* § 24–10–106(1)(c).

## B.

### The City's Liability

#### 1. Scope of Waiver for Premises Liability

■■■■■ We now proceed to examine the scope of the City's potential liability. We note first that the purpose of the CGIA is to allow Colorado's law of negligence to operate against governmental entities, except to the extent that it has barred suit against them. *See Walton*, 968 P.2d at 643. However, even when an immunity waiver applies, we look to the scope of that waiver under the CGIA. *See* § 24–10–106(1). Springer brought her claim pursuant to the premises liability statute, § 13–21–115, 5 C.R.S. (2000). If the extent of the waiver is greater than or equal to the scope of Springer's claims, she may advance her claims against the City.

■■■■■ We examine the breadth of the immunity waiver, keeping in mind that we construe waivers broadly to effectuate their intended goals. *See Corsentino*, 4 P.3d at 1086. We agree that the General Assembly's

intent in creating the "dangerous condition of a public building" immunity waiver was to protect members of the public from unreasonable health and safety risks by encouraging public entities to construct and maintain their buildings for safe use by the persons who use them. *See Kittinger v. City of Colorado Springs*, 872 P.2d 1265, 1268 (Colo. App.1993); *Mentzel v. Judicial Dep't*, 778 P.2d 323, 325 (Colo.App.1989); *see also Walton*, 968 P.2d at 639 (the physical condition of the building combined with the use of the building created a dangerous condition of a public facility). An explicit part of the definition of "dangerous condition" is that a physical condition "constitutes an unreasonable risk to the health and safety of the public." § 24–10–103(1). When an unreasonable health and safety risk of a public building arises from negligent construction or maintenance of the building, the premises liability statute applies.

The General Assembly enacted the premises liability statute to promote, among other aims, "a state policy of responsibility by both landowners and those upon the land." § 13–21–115(1.5)(a). The statute governs civil actions against landowners for injuries occurring on the property. *See* § 13–21–115(2). The statute divides potential claimants into three groups: (1) trespassers;[9] (2) licensees;[10] and (3) invitees.[11] For each of these categories, the statute provides the following:

(a) A trespasser may recover only for damages *willfully or deliberately* caused by the landowner.

(b) A licensee may recover only for damages caused:

(I) By the landowner's *unreasonable failure to exercise reasonable care* with respect to dangers created by the land-

---

8. In its motion to dismiss, the City cited its own expert's conclusion that the threshold plate was initially installed approximately one-half inch higher than specified in the architectural plans.

9. The premises liability statute defines "trespasser" as "a person who enters or remains on the land of another without the landowner's consent." § 13–21–115(5)(a).

10. The premises liability statute defines "licensee" as "a person who enters or remains on the land of another for the licensee's own convenience or to advance his own interests, pursuant

to the landowner's permission or consent. 'Licensee' includes a social guest." § 13–21–115(5)(b).

11. The premises liability statute defines "invitee" as "a person who enters or remains on the land of another to transact business in which the parties are mutually interested or who enters or remains on such land in response to the landowner's express or implied representation that the public is requested, expected, or intended to enter and remain." § 13–21–115(5)(c).

owner of which the landowner actually knew; or

(II) By the landowner's *unreasonable failure to warn of dangers* not created by the landowner which are not ordinarily present on property of the type involved and of which the landowner actually knew.

(c)(I) ... [A]n invitee may recover for damages caused by the landowner's *unreasonable failure to exercise reasonable care to protect against dangers of which he actually knew or should have known.*

§ 13–21–115(3) (emphasis added).

Here, Springer brought her claims under the premises liability statute; she asserts that the public entity's negligent act or omission in constructing or maintaining the facility proximately caused her injury. The intent of the premises liability statute is congruent with the intent of immunity waiver in section 24–10–106(1)(c). Because these claims fall within the scope of the immunity waiver, Springer may advance them.

### 2. Nondelegable Duty

■ Springer was an invitee. The premises liability statute provides, in pertinent part, that "an invitee may recover for damages caused by the landowner's unreasonable failure to exercise reasonable care to protect against dangers of which he actually knew or should have known." § 13–21–115(3)(c)(I). A federal court has construed the statute to require a two-part test for landowner liability: (1) breach of duty to use reasonable care to protect against a danger on the property; and (2) actual or constructive knowledge of the danger. *See Sofford v. Schindler Elevator Corp.,* 954 F.Supp. 1459, 1461 (D.Colo. 1997) (interpreting the premises liability statute in the context of summary judgment).

■ Initially, we consider whether the City may delegate to an independent contractor the duty to protect invitees against dangers set forth in the premises liability statute. Employers of independent contractors have certain nondelegable duties, arising out of some relation with the public, for which they are liable. *See* Restatement (Second) of

Torts §§ 416–429 (1965); W. Page Keeton et al., *Prosser and Keeton on Torts* 511–12 (5th ed.1984) (enumerating situations in which vicarious liability attaches for negligence by independent contractors). The core principle behind all nondelegable duties is "that the responsibility is so important to the community that the employer should not be permitted to transfer it to another." *Id.* at 512.

In particular, section 422 of the Restatement provides for a landowner's nondelegable duty to protect third parties from a structure's unsafe condition due to construction or repair. *See* Restatement (Second) of Torts § 422 (1965). We incorporate our previous examination of section 422 in this regard.

■ The principles of section 422 are consistent with Colorado law. We have held in the context of rental property that a landlord has a nondelegable duty to keep the premises in a reasonably safe condition for the benefit of tenants. *See Frazier v. Edwards,* 117 Colo. 502, 507, 190 P.2d 126, 129 (1948). When enacting the premises liability statute in 1986, the General Assembly extended the duty of landowners to provide safe conditions, not only for tenants, but also for invitees and licensees. *See* ch. 109, sec. 1, § 13–21–115, 1986 Colo. Sess. Laws 683, 683–84. The General Assembly amended the premises liability statute in 1990. *See* ch. 107, sec. 1, § 13–21–115, 1990 Colo. Sess. Laws 867, 867–69. Neither the 1986 version, the 1990 version, nor the current version, includes a provision rejecting *Frazier's* holding that a landowner's duties are nondelegable. Where the legislature could have chosen to restrict the application of a statute, but chose not to, we do not read additional restrictions into the statute. *See Neves v. Potter,* 769 P.2d 1047, 1052–53 (Colo.1989).

■ We therefore conclude that the General Assembly intended to retain the doctrine of nondelegation of premises liability. A landowner may not delegate to an independent contractor the obligation to exercise reasonable care to protect invitees and licensees against dangers within the scope of the statute. *Accord Sofford,* 954 F.Supp. at 1461; *Kidwell v. K–Mart Corp.,* 942 P.2d 1280, 1282 (Colo.App.1996); *Jules v. Embas-*

*sy Prop., Inc.,* 905 P.2d 13, 15 (Colo.App. 1995). As a consequence, the premises liability statute applies to the City as a landowner by reason of the CGIA's immunity waiver for dangerous conditions associated with construction or maintenance of the building.

### 3. Direct Versus Regulatory Duties

Citing our decision in *Board of County Commissioners v. Moreland,* 764 P.2d 812 (Colo.1988), the court of appeals concluded that the City had no liability for injuries arising from failure to inspect and rectify premises defects that violate the City's building code. *See Springer,* 990 P.2d at 1097. *Moreland,* however, does not excuse liability for injuries arising from negligent construction or maintenance of the City's building.

In *Moreland,* the plaintiff fell from the deck of a privately owned cabin. The deck lacked a guardrail in violation of the La Plata County Uniform Building Code. Moreland sued La Plata County, claiming that the county was negligent in failing to force the cabin owner to comply with its building code. A jury found in Moreland's favor, and the court of appeals affirmed. We reversed the court of appeals, holding that "before a private civil liability remedy will be recognized for injuries resulting from a breach of obligations legislatively imposed on a governmental entity and unknown at common law, a clear expression of legislative intent must be found." *Moreland,* 764 P.2d at 818.

The court of appeals apparently read our decision in *Moreland* to mean that the City has no duty to third parties to inspect for defects in its buildings that violate the City's building code. This is an overbroad reading of *Moreland.* As we explained in *State v. Moldovan,* 842 P.2d 220, 228 (Colo.1992), *Moreland* stands only

> for the proposition that when a legislative scheme creates a regulatory duty on a public entity to ensure that a private party is in compliance with safety regulations, the public entity will not be subject to civil tort liability for injuries sustained by a person as a result of the public entity's failure to comply with its regulatory duty in the absence of an express legislative

intent to create a civil tort remedy for such injuries.

In other words, a public entity has no duty to third parties when the claim is for non-enforcement of the building code on property that the public entity does not itself own or operate.

The City is before us in this case not as a regulator, as in *Moreland,* but as a property owner. The City constructed and maintained the property on which Springer fell to her injury. The premises liability statute requires the City, like all landowners, to "exercise reasonable care to protect [invitees] against dangers of which [the City] actually knew or should have known." § 13–21–115(3)(c)(I). The language of the premises liability statute parallels the language in the CGIA, which defines a dangerous condition in part as "an unreasonable risk ... which is known to exist or which in the exercise of reasonable care should have been known to exist." § 24–10–103(1). The premises liability statute imposes a direct duty on the City as a property owner; the CGIA, by its parallel language, anticipates that duty. The City's liability here does not depend upon an alleged regulatory duty to inspect for compliance with the City's building code.

Thus, Springer may pursue her construction and maintenance claims against the City under the premises liability statute, in light of the CGIA's immunity waiver.

### III.

Accordingly, we reverse the judgment of the court of appeals and remand this case with directions to reinstate the order of the district court retaining jurisdiction over Springer's suit.