The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader.  The summaries may not be cited or relied upon as they are not the official language of the division.  Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
August 4, 2022

**2022COA91**

**No. 21CA0322, *Galef v. University of Colorado* — Torts — Personal Injury — Premises Liability; Government — Colorado Governmental Immunity Act — Immunity and Partial Waiver — Dangerous Condition of a Public Building**

For a slip-and-fall tort claim under the Premises Liability Act against the University of Colorado, a division of the court of appeals considers whether the University has waived its sovereign immunity for a "dangerous condition of any public building" under sections 24-10-103(1.3) and -106(1)(c), C.R.S. 2021, of the Colorado Governmental Immunity Act (CGIA).  Specifically, the division considers whether a "dangerous condition" exists when the University fails to post a "wet floor" sign or otherwise warn that a recently mopped dormitory staircase is imperceptibly wet and slippery.

The division first concludes that the University's failure to warn the plaintiff of a hazard it created by mopping can constitute a "dangerous condition," as it is a "negligent . . . omission . . . [in] maintaining" the dormitory that is not attributable solely to the inadequate design of the staircase. *See* § 24-10-103(1.3). The division further reasons that this result is not foreclosed by the supreme court's case law regarding failure-to-warn claims under the CGIA. *See, e.g., Medina v. State*, 35 P.3d 443 (Colo. 2001).

The division then concludes that the imperceptibly wet, slippery stairs — together with the University's failure to warn of them — "constitute[d] an unreasonable risk to the health or safety of the public" under the definition of "dangerous condition" as it's been interpreted by the supreme court. § 24-10-103(1.3); *see City & Cnty. of Denver v. Dennis*, 2018 CO 37.

Court of Appeals No. 21CA0322
Boulder County District Court No. 20CV30831
Honorable Andrew Hartman, Judge

Jordan Galef,

Plaintiff-Appellant,

v.

University of Colorado,

Defendant-Appellee.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division VII
Opinion by JUDGE KUHN
Lipinsky and Graham*, JJ., concur

Announced August 4, 2022

Law Offices of Ross Ziev, P.C., Ross Ziev, Denver, Colorado, for Plaintiff-Appellant

Philip J. Weiser, Attorney General, Hermine Kallman, Special Assistant Attorney General, Denver, Colorado, for Defendant-Appellee

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2021.

¶ 1     In this slip-and-fall personal injury case, plaintiff, Jordan Galef, appeals the trial court's dismissal of his complaint against defendant, the University of Colorado, under C.R.C.P. 12(b)(1).  The court ruled that the University had not waived its immunity for Galef's Premises Liability Act (PLA) claim under the Colorado Governmental Immunity Act (CGIA).  We reverse and remand for further proceedings.

## I.     Background

¶ 2     According to Galef's complaint and other submissions to the court, he was walking down a recently mopped staircase in his dormitory hall when he slipped and fell down the stairs, dislocating his shoulder.  The injury required surgery to repair.

¶ 3     Galef alleged that the black coloring of the flooring made it difficult to see that the stairs were wet and that, when he fell, the University employee mopping the staircase had not displayed a "wet floor" sign or provided any other warning that the stairs were wet.  He also alleged this staircase saw "high traffic" and that he had been using it at least twice per day while a resident of his dormitory.

1

¶ 4    Soon after his injury, Galef brought a single premises liability claim against the University, asserting that he was an invitee to a public building within the meaning of the PLA and CGIA.  He alleged that his injuries were caused by the University's

> (1) unreasonable failure to exercise reasonable care with respect to a wet, slippery stairs [sic] created by [the University] of which [the University] knew or should have known about; and/or
>
> (2) unreasonable failure to exercise reasonable care by failing to put up wet floor signs; and/or
>
> (3) unreasonable failure to warn of wet, slippery stairs.

¶ 5    In response, the University moved to dismiss under Rule 12(b)(1), arguing that it had not waived its CGIA immunity to Galef's claim under the "dangerous condition of any public building" provision of section 24-10-106(1)(c), C.R.S. 2021.  In the ensuing briefing, the University did not dispute any of Galef's factual allegations, and neither side affirmatively requested an evidentiary hearing to determine disputed facts pursuant to *Trinity Broadcasting of Denver, Inc. v. City of Westminster*, 848 P.2d 916

(Colo. 1993).[1]  Instead, the University argued that, based on the allegations in Galef's complaint and submissions to the court, its immunity under section 24-10-106(1)(c) was not waived as a matter of law.  The court agreed with the University and dismissed Galef's complaint.

¶ 6     As relevant here, the court found the following undisputed facts: (1) Galef fell and dislocated his shoulder while descending recently mopped steps that, because of their black coloring, he could not see were wet; (2) there was no wet-floor sign displayed towards individuals approaching the stairs from his location; and (3) mopping the stairs is part of the University's maintenance plan for the dormitory.

¶ 7     Based on these facts, the court ruled that the wet, black stairs — and the University's alleged failure to warn they were wet — did not amount to a "dangerous condition" within the meaning of the CGIA.  In so ruling, the court agreed with the University on the same two issues that Galef appeals here.

---

[1] Galef stated that the motion to dismiss must be denied and, "[i]n the alternative, [he] requires a hearing and discovery to present undisputed facts that would allow the court to make its determination."

¶ 8    First, the court noted that the "negligent act or omission" Galef alleged was the failure to warn him of the wet stairs by not placing a wet-floor sign or some other notification regarding the stairs being mopped. The court then concluded that a public entity does not waive its immunity for a premises liability claim based on a negligent failure to warn because such a failure — without any other alleged negligent act or omission — cannot constitute a "dangerous condition" within the meaning of the CGIA.

¶ 9    Second, the court concluded that — separate and apart from the University's failure to warn him of the hazard — Galef failed to demonstrate that the mere difficult-to-detect wetness of the black flooring otherwise constituted a "dangerous condition." The court reasoned that Galef failed to plead facts and presented no evidence in his briefing showing either that (1) the wet, black, slippery staircase presented an unreasonable risk to the health or safety of the public; or (2) the University committed any other negligent act or omission in constructing or maintaining the building other than the University's alleged failure to post a warning near the wet staircase.

4

## II. Analysis

¶ 10    Galef contends the trial court erred on both points.  We agree and conclude that, based on the unchallenged allegations in Galef's complaint, his submissions to the court, and the reasonable inferences from the trial court's undisputed factual findings, the University's immunity has been waived under section 24-10-106(1)(c) as a matter of law.  We reverse the trial court's dismissal accordingly.

### A. Standard of Review

¶ 11    A Rule 12(b)(1) motion to dismiss on grounds of immunity under the CGIA raises an issue of the court's subject matter jurisdiction.  *Padilla v. Sch. Dist. No. 1*, 25 P.3d 1176, 1180 (Colo. 2001).  The plaintiff has the burden of proving that the court has jurisdiction.  *City of Longmont v. Henry-Hobbs*, 50 P.3d 906, 908 (Colo. 2002).  But "this burden is relatively lenient, as the plaintiff is afforded the reasonable inferences from [his] undisputed evidence."  *City & Cnty. of Denver v. Dennis*, 2018 CO 37, ¶ 11.

¶ 12    Rule 12(b)(1) "permits the trial court to hold an evidentiary hearing to resolve any factual dispute upon which the existence of jurisdiction may turn."  *Medina v. State*, 35 P.3d 443, 452 (Colo.

2001).  Here, however, in its motion to dismiss, the University did not challenge any facts Galef alleged.  The trial court thus relied on the undisputed facts that the parties presented and determined, as a matter of law, whether those facts constituted a waiver of immunity under the CGIA.  *See id.*  We review the resolution of this question of law, along with the associated statutory interpretation it involves, de novo.  *Id.* at 452-53.

¶ 13    Our goal in interpreting the CGIA is to give effect to legislative intent.  *Maphis v. City of Boulder*, 2022 CO 10, ¶ 15.  "In doing so, we look at the statute 'as a whole, giving consistent, harmonious, and sensible effect to all of its parts.'"  *Id.* (quoting *Dennis*, ¶ 12).  We construe waivers of CGIA immunity broadly because "the immunity created by the [CGIA] is in derogation of the common law and must [itself] be strictly construed."  *Bertrand v. Bd. of Cnty. Comm'rs*, 872 P.2d 223, 225 (Colo. 1994); *Springer v. City & Cnty. of Denver*, 13 P.3d 794, 798 (Colo. 2000) ("[W]e broadly construe the CGIA provisions that waive immunity in the interest of compensating victims of governmental negligence.").

B.    The CGIA and the PLA

¶ 14    Section 24-10-106(1) of the CGIA provides as follows:

6

> A public entity shall be immune from liability in all claims for injury which lie in tort . . . except as provided otherwise in this section. Sovereign immunity is waived by a public entity in an action for injuries resulting from:
>
> . . . .
>
> (c) A dangerous condition of any public building.[2]

Section 24-10-103(1.3), C.R.S. 2021, contains a definition of "dangerous condition." In *Walton v. State*, 968 P.2d 636 (Colo. 1998), the supreme court interpreted this definition to mean that immunity is waived under section 24-10-106(1)(c) if the injuries occurred as a result of

(1) the physical condition of the public facility or the use thereof;

(2) which constitutes an unreasonable risk to the health or safety of the public;

---

[2] The University does not dispute that it is a "public entity" within the meaning of the CGIA. § 24-10-103(5), C.R.S. 2021; *see Uberoi v. Univ. of Colo.*, 713 P.2d 894, 897-98 (Colo. 1986), *overruled on other grounds by Graham v. State*, 956 P.2d 556, 562 (Colo. 1998). Nor does it dispute here that Galef's dormitory is a "public building" within the meaning of the CGIA waiver provision at issue. § 24-10-106(1)(c), C.R.S. 2021.

(3)  which is known to exist or should have been known to exist in the exercise of reasonable care; and

(4)  which condition is proximately caused by the negligent act or omission of the public entity in constructing or maintaining the facility.

*Walton*, 968 P.2d at 644; *see Jenks v. Sullivan*, 826 P.2d 825, 827 (Colo. 1992) ("Injury stemming from the use of a dangerous or defective physical condition of the building itself might include injury resulting from, for example, using a faulty elevator or falling down defective stairs."), *overruled by Bertrand*, 872 P.2d 223.

¶ 15    Further, while a "dangerous condition" may be a hazard that the public entity itself creates, that dangerous condition must be one that is "associated with construction or maintenance, not solely design." *Springer*, 13 P.3d at 799, 801; § 24-10-103(1.3) ("A dangerous condition shall not exist solely because the design of any facility is inadequate.").

¶ 16    The supreme court has further interpreted this immunity waiver in the context of the PLA, section 13-21-115, C.R.S. 2021, which "governs civil actions against landowners for injuries occurring on the property." *Springer*, 13 P.3d at 803 (citing

§ 13-21-115(2), C.R.S. 2021).  As relevant here, the PLA provides that "an invitee may recover for damages caused by the landowner's unreasonable failure to exercise reasonable care to protect against dangers the landowner actually knew about or should have known about."  § 13-21-115(4)(c)(I); *see also Gallegos v. Phipps*, 779 P.2d 856, 862 n.11 (Colo. 1989) (noting that a landowner's "duty . . . to protect invitees" under this section is broad enough to encompass a duty to warn an invitee of hazards on the premises).

¶ 17    Construing this provision alongside the CGIA waiver under section 24-10-106(1)(c), the supreme court has held that

> when a public entity provides a public building for public use, it owes a nondelegable duty to protect invitees under [the PLA] from an unreasonable risk to their health and safety due to a negligent act or omission in constructing or maintaining the facility.

*Springer*, 13 P.3d at 797, 803-05 ("The intent of the premises liability statute is congruent with the intent of immunity waiver in section 24-10-106(1)(c). . . .  [C]laims [under section 13-21-115(4)] fall within the scope of the immunity waiver . . . .").

## C. The University's Immunity Is Waived
## As a Matter of Law

¶ 18    Galef alleged in his complaint a hazardous physical condition in his dormitory — wet, slippery stairs that, due to their black coloring, were difficult for him to see that they were wet. His complaint also alleged that the University knew or should have known about this hazard and that this hazard was caused by the University's negligence. We conclude these allegations are sufficient to establish the first and third elements of the *Walton* test.

¶ 19    The fourth *Walton* element evaluates whether the condition was proximately caused by the negligent act or omission of the public entity in constructing or maintaining the facility. The trial court ruled, and we agree, that Galef alleged only one "negligent act or omission of the [University] in constructing or maintaining the facility" under the definition of "dangerous condition" — that the University failed to warn him of the hazardous wet condition of the staircase. Galef does not challenge this finding on appeal. At issue first, then, is whether this failure to warn satisfies the fourth element of the *Walton* test.

¶ 20    According to the University, the supreme court has interpreted "dangerous condition" to categorically exclude instances in which the public entity negligently failed to warn of a hazardous physical condition. We disagree. We see the supreme court's interpretation of "dangerous condition," and the plain statutory text of that term, as permitting a claim for a public entity's failure to warn of a hazardous physical condition under the public-building waiver when (1) the dangerous condition is not "attributable solely to the inadequate design" of the building, *see, e.g., Swieckowski v. City of Fort Collins*, 934 P.2d 1380, 1388 (Colo. 1997); and (2) the failure to warn is a "negligent . . . omission . . . in . . . maintaining the [building],"[3] *see Springer*, 13 P.3d at 799. We further conclude that, under the undisputed facts of this case, the University's failure to warn Galef of the imperceptibly wet, slippery stairs satisfies both conditions.

¶ 21    Alternatively, however, the University argues that the trial court was correct to conclude that Galef's allegations fail to prove

---

[3] Galef did not allege that the University negligently constructed the staircase, so we exclude references to negligent construction in our analysis.

11

the third *Walton* element — that the wet, slippery stairs did not constitute an unreasonable risk to the health or safety of the public. We again disagree. The allegations in Galef's complaint, his submissions to the court, and the reasonable inferences from the trial court's undisputed factual findings demonstrate that the wet, slippery — and unwarned of — stairs "created a chance of injury, damage, or loss which exceeded the bounds of reason." *Dennis,* ¶ 23.

### 1.    Failure-to-Warn Claims Under the CGIA

¶ 22    Citing *Medina*, 35 P.3d 443, the University claims that a public entity's failure to warn of a hazardous physical condition cannot constitute a "dangerous condition" to support a waiver of immunity under section 24-10-106(1)(c) for public buildings.

¶ 23    Galef counters that *Medina* and the supreme court's other failure-to-warn cases are not applicable to the public-building waiver because they relied on a different provision of the CGIA — the public-highway waiver in section 24-10-106(1)(d)(I). That section waives CGIA immunity for a "dangerous condition of a public highway, road, or street which physically interferes with the movement of traffic." It specifically states, though, that "the phrase

12

'physically interferes with the movement of traffic' shall not include traffic signs, signals, or markings, *or the lack thereof.*" § 24-10-106(1)(d)(I) (emphasis added). Galef argues this italicized language — not the general definition of "dangerous condition" — is what the supreme court relied on in excluding the failure to post warning signs from the waiver of sovereign immunity under that public-highway provision.

¶ 24 We disagree with both parties. Galef is correct that this italicized language "expressly precludes liability for a public entity's failure to post signs on a public highway." *Swieckowski,* 934 P.2d at 1388 (citing § 24-10-106(1)(d))*; see Willer v. City of Thornton,* 817 P.2d 514, 519 (Colo. 1991) ("Th[e] language [in section 24-10-106(1)(d)] excludes the failure to post warning signs from the general waiver of sovereign immunity for injuries resulting from dangerous conditions."). But contrary to Galef's position, though *Medina* and the supreme court's failure-to-warn cases all arose in the context of the public-highway waiver under section 24-10-106(1)(d), these cases also relied on the definition of "dangerous condition" itself — which could make the cases applicable to the public-building waiver as well. *See* § 24-10-103

(stating that the definition of "dangerous condition" applies throughout the CGIA "unless the context otherwise requires"). Further, contrary to the University's position, we conclude that this definition does not always preclude a waiver for a dangerous condition of a public building where the public entity's sole alleged negligent act or omission is a failure to warn of a hazardous physical condition.

¶ 25    *Medina* involved plaintiffs who were injured while driving along a public highway when a large boulder dislodged from a "cut slope" above the road and crashed through their vehicle. *Medina*, 35 P.3d at 448. As part of their complaint, the plaintiffs claimed that the state negligently failed to close the highway, warn the public that it was unsafe, and suggest alternative routes of travel. *Id.* at 462. Noting that each claim amounted to no more than a general failure-to-warn claim, the court offered two justifications why it could dispatch them "summarily" — that is, without first needing resolution of disputed facts. *See id.* at 449, 462 ("[W]e hold that, as a matter of law, the CGIA does not waive immunity for claims asserting a failure to warn, failure to close the highway, or failure to suggest alternate routes."). *But see Maphis*, ¶ 27 n.3 (stating, in a

14

footnote in a case under section 24-10-106(1)(d), that "'[n]egligent failure to warn' does not 'trigger[] a waiver of immunity under the CGIA.'" (quoting *Medina*, 35 P.3d at 449)).

¶ 26    First, *Medina* noted that "our precedent makes clear that the CGIA has not waived the state's immunity for such a claim." *Medina*, 35 P.3d at 462.  But the cases the court cited do not stand for the broad conclusions that Galef and the University urge us to adopt.  *Id.* (first citing *Swieckowski*, 934 P.2d at 1386; then citing *Willer*, 817 P.2d at 517-19; and then citing *Szymanski v. Dep't of Highways*, 776 P.2d 1124, 1125 (Colo. App. 1989)).  Rather, each case grounded this conclusion in both the express preclusion language of the public-highway waiver as well as the definition of "dangerous condition" itself.  For the latter, these cases dictate that a public entity's failure to warn of a hazardous physical condition does not fall within this definition when the dangerous condition is attributable solely to the inadequate design of the facility.  *See Willer*, 817 P.2d at 519 ("Whatever the merits of Willer's argument that a governmental entity should never be granted the protection of sovereign immunity when it fails to warn others of known dangerous conditions, the [CGIA] reveals a contrary legislative

15

intent when the alleged defect is incorporated in the initial design.");
*Swieckowski*, 934 P.2d at 1389 (Vollack, C.J., dissenting) ("[T]he
[public entity] is immune from claims which assert either an
inadequate design or a failure to post warning signs." (citing
§§ 24-10-103(1), -106(1)(d), C.R.S. 1997)); *Szymanski*, 776 P.2d at
1125 ("Here, the gist of plaintiffs' complaint against the City was
that [among other claims] there was no warning sign advising traffic
that the intersection was dangerous.  Despite plaintiffs' attempts to
characterize these alleged flaws as other than design defects, all of
them relate to claimed inadequacies in the design of that
intersection."); *see also Henry-Hobbs*, 50 P.3d at 909 (noting that,
for a hazard that is dangerous as designed, a failure to post a
warning sign near it can be characterized as a "design flaw").

¶ 27    Second, *Medina* further concluded that these failure-to-warn
claims are not "somehow encompassed within the state's duty of
maintenance."  35 P.3d at 462.  It reasoned that, under the then-
existing definition of "maintenance," the "duty to maintain" a public
highway is defined as "a duty to keep the road 'in the same general
state of being, repair, or efficiency as initially constructed.'"  *Id.* at
455 (quoting *Swieckowski*, 934 P.2d at 1385).  Then, because

16

"[c]losing the road, warning of the road's dangerous condition, or suggesting alternate routes of travel do not effectuate this result," the court concluded that these claims "do not fall within the state's maintenance obligation for which immunity has been waived." *Id.* at 462.

¶ 28    In other words, contrary to the University's position, *Medina*'s second line of reasoning does not mean that a public entity's negligent failure to warn may never support a finding of a "dangerous condition" under the CGIA — but rather only that this duty to warn must be encompassed within the entity's duty of maintenance instead of being a design flaw. *See Douglas v. City & Cnty. of Denver*, 203 P.3d 615, 619-20 (Colo. App. 2008) (In a case involving an injury resulting from lifting weights in a city-run gym, the division concluded "the failure to post warning signs [about the danger of lifting weights] . . . does not involve the use of a dangerous physical condition of the building that is associated with its maintenance. . . . [U]nder the circumstances presented here, the failure to post a sign is not a maintenance issue.").

¶ 29    In summary, then, a "dangerous condition" can include a public entity's failure to warn of a hazardous physical condition in a

17

public building when (1) the dangerous condition is not attributable solely to the inadequate design of the building, and (2) the public entity's duty to warn of a hazard is encompassed within its duty of maintenance.

### 2. The University's Duty to Warn of the Wet Stairs

¶ 30    We further conclude that the University's alleged failure to post a warning next to the imperceptibly wet, recently mopped stairs constitutes a negligent act or omission proximately causing the hazardous physical condition under the undisputed facts of this case.

¶ 31    First, there is no question here that the stairs were designed to be dry, not wet.  While the design of the staircase — their black coloring — may have contributed to the difficulty of perceiving that they were wet, the University made the stairs more hazardous by subsequently introducing a wet, slippery substance onto them. *Medina*, 35 P.3d at 456 (noting that conditions implicating defective maintenance rather than design "*develop* subsequent to the initial design and construction of the [facility]").  Therefore, the hazard of which the University allegedly failed to warn Galef was not solely attributable to the design of the staircase.  *See* § 24-10-103(1.3).

18

¶ 32     Second, we conclude that the University's duty to warn Galef of a hazard its employee created in mopping the dormitory stairs is "encompassed within [the University's] duty of maintenance." *Medina*, 35 P.3d at 462.  As relevant here, the CGIA defines "maintenance" as "the act or omission of a public entity or public employee in keeping a facility in the same general state of repair or efficiency as initially constructed or in preserving a facility from decline or failure."  § 24-10-103(2.5).

¶ 33     The undisputed fact in this case is that "mopping the stairs is part of the University's maintenance plan for the dormitory."  That is, the University was mopping the stairs to keep them in the same clean condition as they were originally designed and constructed. Mopping, then, falls within the CGIA's definition of "maintenance" as it is an act done "in preserving [the dormitory] from decline."  *See* § 24-10-103(2.5).  Further, Galef alleged that the University failed to warn him of a hazard it created while mopping — that is, while the University was "maintaining" the building.  Under the definition of "dangerous condition," then, this failure to warn is a "negligent . . . omission . . . in . . . maintaining" the dormitory.  *See* § 24-10-103(1.3); *see also N.M. v. Trujillo*, 2017 CO 79, ¶¶ 25-27

19

(recognizing a distinction between claims based on the defendant's misfeasance, or active misconduct causing a positive injury to other, and nonfeasance, or passive inaction or a failure to protect from harm). The University's duty of maintenance under the CGIA thus encompasses a duty, under the PLA, to warn of the wet, slippery condition the University created while mopping a dormitory staircase.

¶ 34    *Medina* is distinguishable under these facts. In that case, the supreme court could not conclude, on the undisputed facts before it, whether the hazardous cut slope on the public highway was either (1) designed to be that way or (2) the result of the degradation of the slope above the road that occurred after the road was designed and constructed. *Medina*, 35 P.3d at 458-59. If the former, the court concluded, the CGIA did not waive the state's immunity. *Id.* at 455, 459. But if the hazardous condition developed after the road was designed and constructed, the state's immunity could be waived because it would have failed in its "duty to maintain" the road, and the state might therefore have had an obligation to install "safety devices" on the cut slope to rectify the

hazard and "return the road to its original state of being, repair, or efficiency." *Id.* at 461-62.

¶ 35     In this context, the supreme court concluded that the state's duty to warn of the hazardous cut slope was not encompassed within its duty to rectify hazards that develop after the design and construction of a facility. *See id.* at 454-58, 462. And, just as posting a warning sign next to a hazardous cut slope doesn't itself rectify that physical condition, it's true that here, posting a wet-floor sign next to wet stairs also does not itself rectify their physical condition — the wet-floor sign does nothing to help the stairs dry. But in *Medina*, there was no allegation that the hazardous physical condition developed *as a result* of the state's affirmative actions in undertaking maintenance of the road. In contrast, here the University affirmatively created — and then failed to warn of — the hazard as part of its maintenance of the dormitory staircase.

¶ 36     Thus, *Medina* had no occasion to consider whether a public entity's "duty of maintenance" under the CGIA encompasses a duty to warn of hazards *created by* the public entity's acts of

maintenance.[4]  And in this case, we conclude that the University's duty to warn Galef of the wet, slippery stairs fits squarely within the definitions of "dangerous condition" and "maintenance" under the CGIA.  We therefore see *Medina* as distinguishable on this basis.

¶ 37    For these reasons, we conclude that the University's alleged negligent failure to warn Galef of wet, slippery stairs is a "negligent omission in maintaining" the dormitory within the meaning of "dangerous condition."  The trial court therefore erred by excluding the University's alleged failure to warn Galef from its "dangerous condition" analysis.

### 3.    The Wet, Slippery Stairs Constituted an Unreasonable Risk

¶ 38    Alternatively, the University argues that Galef failed to carry his burden in demonstrating the third element of the *Walton* test: that the physical condition in question — the imperceptibly wet,

---

[4] Notably, too, the General Assembly has since broadened the definition of "maintenance" from that existing when *Medina* was decided.  At that time, section 24-10-103 did not define "maintenance," but two years later, the General Assembly added a definition of this term to the statute.  Ch. 182, sec. 2, § 24-10-103(2.5), 2003 Colo. Sess. Laws 1343.  "Maintenance" is now defined as "act[s] or omission[s] . . . in preserving a facility from decline or failure."  § 24-10-103(2.), C.R.S. 2021.

slippery stairs — "constitute[d] an unreasonable risk to the health or safety of the public." § 24-10-103(1.3). We disagree.

¶ 39     Determining if a physical condition presents an unreasonable risk "will necessarily be a fact-specific inquiry." *Dennis*, ¶ 23. Since there are no disputed facts, however, we can undertake this review as a question of law. *See Medina*, 35 P.3d at 452. We examine the totality of the circumstances surrounding the hazard in making this determination. *Maphis*, ¶ 28.

¶ 40     In this context, the supreme court has interpreted "unreasonable risk" to require the plaintiff to prove that the physical condition "created a chance of injury, damage, or loss which exceeded the bounds of reason." *Dennis*, ¶ 23. Further, the court has explained that "because the term 'unreasonable' modifies the word 'risk,' the CGIA requires '*more* than a *foreseeable* risk of harm.'" *Maphis*, ¶ 19 (quoting *Dennis*, ¶ 22).

¶ 41     Nonetheless, several of the unchallenged allegations from Galef's complaint, his submissions to the court, and reasonable inferences from the trial court's undisputed facts support the

conclusion that the imperceptibly wet, slippery stairs created a chance of injury that exceeded the bounds of reason.[5]

¶ 42    First, the supreme court has indicated that the type and severity of injuries risked by the physical condition are relevant to whether that condition chanced an injury exceeding the bounds of reason. *See id.* at ¶ 24; *see also id.* at ¶¶ 46-47 (Márquez, J., dissenting). Galef alleged he suffered an injury severe enough that it would require two surgeries to repair. He also submitted a report indicating that slippery floors in general risk a myriad of severe injuries — including a significant chance of death. And further, the risks of a wet, slippery *staircase* go beyond those associated with a mere slippery *floor*; falling down stairs poses a far more unreasonable risk of injury than a mere "tripping hazard" like the hazard in *Maphis* — an uneven sidewalk. *See id.* at ¶ 24 (majority opinion).

¶ 43    It's true that *Maphis* ruled that "the frequency with which a particular condition occurs is an appropriate consideration" when

---

[5] Many of the following considerations are taken from *Maphis*, which was decided after the trial court issued its order dismissing Galef's complaint.

evaluating whether a physical condition poses an unreasonable risk. *Id.* at ¶ 29. And Galef's submitted report indicated that slip-and-fall injuries are a frequent source of injury for the general public. But the court's concerns in *Maphis* about the frequency of the hazard in that case are not present here. Unlike for a commonplace sidewalk hazard, exposing the University to liability for the wet stairs would not impose an "impossibly high standard" on the University. *Id.* (quoting *Dennis*, ¶ 19). A wet floor will dry on its own and there is a cheap and available solution to mitigate the risk posed by wet flooring — posting a wet-floor sign.

¶ 44 Second, the supreme court has indicated that the degree to which the hazard is responsible for causing the plaintiff's injury is also relevant to the unreasonableness of the risk it poses. *See Dennis*, ¶ 24; *Maphis*, ¶ 41 (Márquez, J., dissenting). Galef alleged, and the University did not challenge, that his injury was caused primarily by the imperceptibly wet, slippery stairs.

¶ 45 Third, the supreme court has noted that the location of the physical condition bears on this analysis. *Maphis*, ¶ 28 (majority opinion). Galef's complaint and affidavit alleged that the hazardous physical condition was located in both a "high foot-traffic area" and

an "area of heightened public safety concern" — inside a school. The supreme court has found that both kinds of locations make the risk more unreasonable. *Id.*

¶ 46 Finally, the supreme court has noted that conditions that are difficult to detect pose a more unreasonable risk of injury, particularly when the public entity failed to call attention to the hazard by warning the public of its presence. *See id.* at ¶ 27; *see also id.* at ¶ 39 n.1 (Márquez, J., dissenting). Galef alleged that the black coloring of the staircase made it difficult for him to detect that it had been recently mopped — a difficulty that was compounded by the University's failure to post a wet-floor sign where Galef could see it.

¶ 47 For these reasons, we conclude that Galef successfully demonstrated that the imperceptibly wet, slippery stairs posed an unreasonable risk to the health and safety of the public. Thus, in combination with the other undisputed facts, he sufficiently carried his burden to demonstrate that his injuries resulted from a "dangerous condition of any public building" under section 24-10-106(1)(c). Under these circumstances, we conclude, as a

matter of law, that the University waived its immunity under the CGIA. The trial court erred by ruling otherwise.

## III. Conclusion

¶ 48 The judgment of dismissal is reversed and the case is remanded for further proceedings consistent with this opinion.

JUDGE LIPINSKY and JUDGE GRAHAM concur.