2022 CO 10 Joy Maphis, Petitioner v. City of Boulder, Colorado, Respondent No. 20SC646
Supreme Court of Colorado
February 22, 2022

 Certiorari to the Colorado Court of Appeals Court of Appeals
Case No. 19CA203

 Attorneys for Petitioner: Randall J. Paulsen &
 Associates, P.C. Randall J. Paulsen, O'Brien Law Firm,
 LLC, Shauna O'Brien.

 Attorneys for Respondent: Office of the City Attorney Sandra
 M. Llanes Luis A. Toro.

 Attorney for Amicus Curiae Colorado Intergovernmental Risk
 Sharing Agency: Samuel J. Light

 Attorneys for Amicus Curiae Colorado Municipal League: David
 W. Broadwell Laurel Witt.

 Attorney for Amicus Curiae Colorado Trial Lawyers
 Association: Just Law Group, LLC John F. Poor.

 JUSTICE HART delivered the Opinion of the Court, in which
 CHIEF JUSTICE BOATRIGHT, JUSTICE HOOD, and JUSTICE
 BERKENKOTTER joined. JUSTICE MÁRQUEZ, joined by
 JUSTICE GABRIEL and JUSTICE SAMOUR, dissented.

 OPINION

 HART,
 JUSTICE.

 ¶1
 After tripping over a deviation in a sidewalk in the City of
 Boulder ("City"), Joy Maphis sued the City for her
 injuries under the Colorado Governmental Immunity Act
 ("CGIA"). The City moved to dismiss for lack of
 subject matter jurisdiction, arguing that it was immune from
 suit as the sidewalk did not constitute a "dangerous
 condition" under section 24-10-106(1)(d)(1), C.R.S.
(2021), of the CGIA. The district court denied the City's
 motion based on its finding that the deviation was
 "difficult to detect" and was larger than what the
 City classified as a "hazard" warranting repair.
The City appealed, and the court of appeals reversed,
 concluding that the undisputed evidence failed to establish
 that the sidewalk presented the type of dangerous condition
 for which the City had waived its immunity from
 suit.[1]

 ¶2
We agree with the court of appeals that Maphis failed to
 establish a waiver of immunity. Reviewing de novo the legal
 question of whether the sidewalk constituted a dangerous
 condition under the CGIA, we hold that Maphis's evidence
 did not establish that the sidewalk deviation presented a
 risk that "exceeded the bounds of reason." City
 & Cty. of Denver v. Dennis, 2018 CO 37, ¶ 23,
 418 P.3d 489, 497. Accordingly, we affirm the court of
 appeals and hold that the City retained its immunity from
 suit under the CGIA.

 I.
Facts and Procedural History

 ¶3
 On April 8, 2017, Maphis tripped over a two-and-a-half-inch
 deviation in a concrete sidewalk in the City and fell,
 fracturing both elbows and injuring her face. The City had
 identified the sidewalk as needing repair just weeks earlier
 and was only a few days away from making those repairs at the
 time of her fall.

 ¶4
 Maphis filed suit against the City to recover for her
 injuries, alleging that the City was liable because it knew
 of the dangerous condition of the sidewalk yet failed to
 correct the condition or warn pedestrians of its
 existence.[2] The City moved to dismiss Maphis's
 claim for lack of subject matter jurisdiction under

section 24-10-106(1)(d)(1), which waives governmental
 immunity for a "dangerous condition." It alleged,
 in part, immunity from suit because the deviation in the
 sidewalk was not "unreasonably dangerous" under the
 standard for what constitutes a "dangerous
 condition," as articulated by this court in
 Dennis, ¶ 23, 418 P.3d at 497.

 ¶5
 To determine whether the City had waived its immunity, the
 district court held an evidentiary hearing pursuant to
 Trinity Broadcasting of Denver, Inc. v. City of
 Westminster, 848 P.2d 916 (Colo. 1993). Both Maphis and
 the City's Principal Transportation Projects Engineer,
 Gerrit Slatter, testified. Maphis testified to the extent of
 her injuries and to the fact that the deviation "was
 invisible. You couldn't see it when you were
 walking." She further testified that, in her opinion,
 the deviation was unreasonably dangerous.

 ¶6
 Slatter testified about the City's sidewalk repair
 program and the condition of the sidewalk. He first explained
 that the City runs both a proactive and a reactive repair
 program. Through the proactive program, the City
 independently identifies and repairs damaged sidewalks as it
 works through geographic zones; while through the reactive
 program, the City receives a complaint or concern about a
 particular sidewalk and fixes it. Under the proactive
 program, Slatter explained, the City (1) "consults with
 an engineering consultant [who] goes through the zone to
 identify areas that are in need of repair . . . and . . .
 develop[s]

 an exhibit and a cost estimate"; (2) "use[s] that
 to work with a contractor to develop a scope of work and get
 a construction estimate"; (3) has "a public
 engagement effort" to "notify the neighborhood . .
 . that there will be sidewalk repair work happening over the
 coming year or two"; (4) "send[s] individual
 letters . . . indicating whether a repair will be implemented
 in front of their property"; and (5) has an
 "engineering technician[ ] . . . field visit and field
 edit the recommendations from the consultant to make sure
 that there is concurrence with the recommendations" and,
 "if they identify other repairs that may be needed
 within the zone, they . . . mark those locations and then
 notify the adjacent property owners." Here, Slatter
 testified, the sidewalk deviation was not identified in the
 initial review of the geographic zone in 2015. It was
 identified and "marked . . . for repair" during the
 field visit by the City's engineering technician shortly
 before the previously scheduled repairs for the zone were
 going to take place.

 ¶7
 Slatter further agreed to the fact that "a deviation
 greater than three quarters of an inch constitutes a
 hazard" under the City's sidewalk repair program and
 that such a deviation indicates the sidewalk is unsafe as
 "a potential tripping hazard." He also explained
 that when the sidewalk repair program was "conceived in
 2010, the thought was that there would be sufficient funding
 to . . . address all the sidewalk repair needs within a
 geographic zone on a yearly basis." However,

"budget limitations and being able to address the
 repairs that are needed" mean that the City needs
 "a couple of years" to work through each zone.

 ¶8
 After the Trinity hearing, the district court issued
 a minute order concluding that the City waived its immunity
 because the sidewalk deviation "constituted a
 'dangerous condition.'" It specifically found
 that:

• "a sidewalk deviation greater than [three
 quarters] of an inch constitutes a 'hazard' by the
 City's own definition";

• the deviation of the sidewalk was approximately
 two-and-a-half inches in height at the time of Maphis's
 fall; and

• the deviation was "largely imperceptible."
On these facts, the district court reasoned that because
 "the coloring of the sidewalk ma[de] the deviation
 difficult to detect, increase[d] the degree of the tripping
 hazard, and thus the risk to the walking public," it
 constituted an "unreasonable risk of harm to the health
 and safety of the public, such that [Maphis] . . . over[came]
 her burden to prove that the City . . . waived its
 immunity."

 ¶9
 The City appealed the district court's order, and, in a
 divided opinion, a division of the court of appeals reversed.
Maphis v. City of Boulder, No. 19CA0203 (June 25,
 2020). Reviewing de novo the question of whether the
 deviation in the sidewalk constituted a "dangerous
 condition," the division majority concluded that while
 "there is little doubt that the sidewalk's condition
 created some risk" as

 a tripping hazard, that risk was not one that "exceeded
 the bounds of reason" under the standard set forth by
 this court in Dennis. Maphis at ¶ 26.
In particular, the division noted that the undisputed facts
 showed (1) the City had received no citizen complaints about
 this sidewalk deviation; (2) the deviation had not been
 identified as needing repair during the City engineer's
 assessment of the zone in 2015 but had instead been
 identified during a routine area inspection just weeks before
 the accident; and (3) undisputed testimony and exhibits at
 the Trinity hearing demonstrated that uneven
 sidewalks are commonplace in Boulder. Id. at ¶
 26. Given these facts, the division majority concluded that
 the sidewalk deviation did not constitute a "dangerous
 condition" for purposes of waiving the City's
 immunity under the CGIA. This conclusion, the division
 explained, aligns with the "General Assembly's
 intent to lessen potential burdens on taxpayers, and to
 permit municipalities to prioritize repairs."
Id. at ¶ 32.

 ¶10
Judge Richman, dissenting, reasoned that the City
 "created a dangerous condition and its failure to act
 [was] unreasonable" because it had identified the
 sidewalk for repair but had not yet repaired it at the time
 of Maphis's fall. Id. at ¶ 44. ¶11
 Maphis petitioned this court for certiorari, and we granted
 review.

 II.
Analysis

 ¶12
We begin by explaining that questions of sovereign immunity
 under the CGIA present mixed questions of fact and law, with
 jurisdictional facts reviewed for clear error and the
 question of whether those facts constitute a "dangerous
 condition" for purposes of the CGIA reviewed de novo. We
 then review de novo whether the sidewalk deviation in this
 case constituted a dangerous condition under the standard for
 "unreasonable risk" announced in Dennis.
We conclude that it did not.

 A.
Standard of Review

 ¶13
 Whether the CGIA applies to protect the government from suit
 is a question of subject matter jurisdiction governed by the
 standard for dismissal pursuant to C.R.C.P. 12(b)(1).
Dennis, ¶¶ 9-10, 418 P.3d at 494; St.
 Vrain Valley Sch. Dist. RE-1J v. Loveland, 2017 CO 54,
 ¶ 10, 395 P.3d 751, 754. As such, the plaintiff carries
 the burden of proof to show that the government waived its
 immunity. Dennis, ¶ 11, 418 P.3d at 494;
see also City & Cty of Denver v. Crandall, 161
 P.3d 627, 632 (Colo. 2007) (explaining that "in a
 Trinity hearing on a C.R.C.P. 12(b)(1) motion to
 dismiss, the plaintiff must carry the burden of proving
 jurisdictional facts adequate to support subject matter
 jurisdiction"). But "this burden is relatively
 lenient" in the CGIA context "as the plaintiff is
 afforded the reasonable inferences from [their] undisputed
 evidence." Dennis, ¶ 11, 418 P.3d at 494.

 ¶14
 It is well-established that the application of sovereign
 immunity presents a mixed question of fact and law. See
id. at ¶ 12, 418 P.3d at 494 (explaining the
 standard of review for determining whether sovereign immunity
 applies); St. Vrain Valley Sch. Dist. RE-1J, ¶
 10, 395 P.3d at 754 (same); Crandall, 161 P.3d at
 633 (same); Tidwell ex rel. Tidwell v. City & Cty. of
 Denver, 83 P.3d 75, 81 (Colo. 2003) (same). The district
 court makes "factual findings about its ability to hear
 the case," Dennis, ¶ 9, 418 P.3d at 494,
 and resolves "any factual dispute[s] upon which the
 existence of jurisdiction may turn," Swieckowski v.
 City of Ft. Collins, 934 P.2d 1380, 1384 (Colo. 1997).
On appellate review, we defer to the district court's
 factual findings unless they are clearly erroneous.
Dennis, ¶ 12, 418 P.3d at 494.

 ¶15
"Once the questions of fact are resolved, we review
 questions of governmental immunity de novo,"
id., as the only remaining question "is one of
 statutory interpretation," St. Vrain Valley Sch.
 Dist. RE-1J, ¶ 10, 395 P.3d at 754. When
 interpreting a statute, our goal is to give effect to
 legislative intent. Elder v. Williams, 2020 CO 88,
 ¶ 18, 477 P.3d 694, 698. In doing so, we look at the
 statute "as a whole, giving consistent, harmonious, and
 sensible effect to all of its parts." Dennis,
 ¶ 12, 418 P.3d at 494.

 ¶16
 Applying these principles, we now review de novo whether the
 condition of the sidewalk on which Maphis tripped constitutes
 a "dangerous

 condition"-and whether the City thus waived its
 governmental immunity under section 24-10-106(1)(d)(1) of the
 CGIA.

 B.
A "Dangerous
Condition" Under
the CGIA Is a
 Physical Condition that Constitutes an Unreasonable
 Risk

 ¶17
 The CGIA provides immunity to public entities in claims for
 injuries that lie in or could lie in tort but waives this
 immunity in certain limited circumstances. § 24-10-106.
Responding to this court's prior abrogation of sovereign
 immunity, the General Assembly enacted the CGIA with the
 purposes of (1) protecting governments from unlimited
 liability that could "disrupt or make prohibitively
 expensive the provision of . . . essential public
 services," § 24-10-102, C.R.S. (2021); (2)
 protecting taxpayers "against excessive fiscal
 burdens" as they would "ultimately bear the fiscal
 burdens of unlimited liability," id.; and (3)
"permit[ting] a person to seek redress for personal
 injuries caused by a public entity" in circumstances
 identified in the statute, State v. Moldovan, 842
 P.2d 220, 222 (Colo. 1992). Because the CGIA derogates the
 common law, we construe its immunity provisions strictly but
 waiver provisions broadly. Elder, ¶ 20, 477
 P.3d at 698.

 ¶18
 At issue in this case is the provision that waives immunity
 in an action for injuries resulting from the "dangerous
 condition of a . . . sidewalk." §
 24-10-106(1)(d)(1). The CGIA expressly defines a
 "dangerous condition" as "a physical condition
 . . . that constitutes an unreasonable risk to the
 health or safety of the public." § 24-10-103(1.3),
 C.R.S. (2021) (emphasis added).

 ¶19
 In Dennis, we held that "'unreasonable'
 in this context means 'exceeding the bounds of reason or
 moderation.'" ¶ 23, 418 P.3d at 497 (quoting
 Unreasonable, Webster's Third New International
 Dictionary (unabr. ed. 2002)). We explained that because the
 term "unreasonable" modifies the word
 "risk," the CGIA requires "more than
 a foreseeable risk of harm." Id. at
 ¶ 22, 418 P.3d at 497 (emphases added). In other words,
 there are "situations when there is a chance the
 [condition] could cause an injury, or it is foreseeable that
 [it] could cause an injury" but the government
 nonetheless does not waive its immunity. Id. This
 balance is necessary because the CGIA waives governmental
 immunity in a narrower class of circumstances than those that
 might subject a private entity to liability.

 ¶20
 Applying this standard in Dennis, we held that the
 condition of a road, though somewhat deteriorated, was not
 unreasonable. There, a passenger on a motorcycle was injured
 at an intersection in Denver when the driver of a car turned
 in front of the motorcycle and "effectively [cut]
 off" the motorcycle. Id. at ¶ 3, 418 P.3d
 at 493. The driver of the motorcycle attempted to stop before
 hitting the car but was unable to, and the passenger was
 flung from the motorcycle and suffered severe injury.
Id. The passenger sued the City and County of Denver
("Denver") alleging that the condition of the road
 at the intersection prevented the driver from effectively
 stopping the motorcycle. Id. at ¶ 4, 418 P.3d
 at 493.

 ¶21
 Reviewing whether the condition of the road constituted a
 "dangerous condition," we found that the plaintiff
 presented evidence showing a "deteriorated
 road"-i.e., "cracked and rutted"-"but not
 a road which was unreasonably risky on which to
 drive." Id. at ¶ 26, 418 P.3d at 498
(emphasis added). We explained that "while [the
 plaintiff] is afforded the inferences of her undisputed
 evidence, she nevertheless bore the burden of proving that
 the road constituted an unreasonable risk." Id.
And we concluded that the plaintiff had not met that burden.
Thus, Denver had not waived its governmental immunity.

 ¶22
We reiterate today that to prove the "dangerous
 condition" element of the immunity waiver, a plaintiff
 must show that the "condition created a chance of
 injury, damage, or loss which exceeded the bounds of
 reason." Id. at ¶ 23, 418 P.3d at 497.
Assessing whether the plaintiff has met this burden requires
 examining the totality of the circumstances presented by the
 undisputed evidence as to whether that particular condition
 presented an unreasonable risk. Id.

 C.
The Sidewalk Deviation Did Not Constitute a Dangerous
 Condition

 ¶23
 Turning to the present case, we now consider whether Maphis
 met her burden to show that the sidewalk condition created a
 chance of injury, damage, or loss which exceeded the bounds
 of reason, such that the City could be liable for her
 injuries.

 ¶24
 Maphis contends that the sidewalk condition constituted an
 unreasonable risk because the two-and-a-half-inch deviation
 exceeded the City's criteria for a tripping hazard by
 three fold and its coloration made it hard to see. On the
 undisputed facts at the Trinity hearing, we agree
 with the division that these factors alone do not outweigh
 the evidence demonstrating that this sidewalk condition-while
 undeniably significant for Maphis-did not constitute the type
 of "dangerous condition" for which the CGIA waives
 governmental immunity.

 ¶25
 First, we note that the condition was not unreasonable merely
 because the deviation exceeded the City's criteria for a
 "hazard" needing repair and the City had therefore
 marked it for repair. "Hazard" is synonymous with
 "risk." Hazard, Merriam-Webster Online,
 https:/ /www.merriam- webster.com/dictionary/hazard
 [https://perma.cc/6QRY-M39T]. And, as we observed in
 Dennis, the term "unreasonable" modifies
 the word "risk" in the CGIA. ¶ 23, 418 P.3d at
 497. Thus, the mere fact that the City was aware of the
 deviation and had scheduled it for repair because they
 classified it as a hazard is not enough to qualify it as an
 "unreasonable risk." The statutory language
 requires looking beyond the City's criteria to determine
 whether the acknowledged hazard is one that exceeded the
 bounds of reason.

 ¶26
 Further, the fact that the City had identified the deviation
 as needing repair does not make the risk it presents an
 unreasonable one. Certainly, once the City

 had identified the deviation for repair-just weeks before the
 accident-the risk was foreseeable. But, as we explained in
 Dennis, a waiver of immunity requires more than
 foreseeable risk. ¶ 22, 418 P.3d at 497.

 ¶27
 Giving Maphis the benefit of all reasonable inferences from
 the undisputed evidence, the coloration of the sidewalk here
 did make the two-and-a-half-inch deviation "difficult to
 detect." And the fact that the deviation was three times
 the height of the City's "hazard" criteria
 might also have increased the risk it presented. But the
 degree of risk still did not exceed the bounds of reason as
 (1) deviations in slab sidewalks are commonplace throughout
 Colorado due to the harsh climate and other environmental
 factors; (2) the deviation was located in a residential area
 without any heightened safety concerns; and (3) the City had
 not received any citizen reports through its reactive program
 about the sidewalk.[3]

 ¶28
 Of course, in examining the totality of the circumstances
 shown by the undisputed facts in a different case, there
 certainly could be instances where a two-and-a-half-inch
 sidewalk deviation would constitute a dangerous
 condition. For example, the location of such a deviation in a
 high foot-traffic area or an area of

 heightened public safety concern-such as at the entrance of
 an assisted-living facility, hospital, school, or daycare-or
 frequent citizen reporting of the condition would be
 additional evidence that might help a plaintiff meet the
 burden of proof. But none of these facts is present here. The
 City did not receive any complaints about this sidewalk
 deviation and only identified it independently for proactive
 repair on a second review of the neighborhood sidewalks just
 weeks before it was repaired.

 ¶29
 Maphis argues that the relative frequency of sidewalk
 deviations should not influence our reasonableness analysis
 as it lets municipalities off the hook for dangerous
 conditions just because those conditions are widespread. But
 the purposes of the CGIA suggest that the frequency with
 which a particular condition occurs is an appropriate
 consideration when evaluating whether governmental immunity
 has been waived. As the amicus brief submitted by the
 Colorado Municipal League explained, "no municipal
 sidewalk system is perfectly hazard-free at all times,"
 and local governments seeking to maintain their sidewalks are
 constrained not only by budgetary limitations, but also by
 the availability of contractors who can do the needed
 repairs. See Brief Amici Curiae, the Colorado Municipal
 League and the Colorado Intergovernmental Risk Sharing
 Agency, in Support of the City of Boulder, at
 2. We cannot ignore the realities that
 Colorado's local governments face in trying to maintain
 roads and sidewalks. As we explained in

Dennis, doing so would impose an "impossibly
 high standard" whereby "state and local governments
 [must] keep [sidewalks] like new at all times." ¶
 19, 418 P.3d at 496. This would significantly
 increase-not reduce-potential burdens on taxpayers. We
 described in Dennis, and we emphasize here:

The [City] could not simultaneously fix every [sidewalk];
 some [sidewalks] would be prioritized and renovated before
 others. And when a [pedestrian] was injured on one of the
 non-prioritized [sidewalks] that were awaiting renovation,
 the government would be potentially liable for not fixing the
 [sidewalk]. Thus, the taxpayers would be footing both the
 costs of making [sidewalks] like new and the costs of
 potential lawsuits.

Id.

 ¶30
 Thus, based on the totality of the circumstances presented by
 the undisputed evidence in this case, we hold that Maphis
 failed to establish that the sidewalk deviation created a
 chance of injury, damage, or loss which exceeded the bounds
 of reason.

 III.
Conclusion

 ¶31
 Reviewing de novo whether Maphis established that the
 sidewalk deviation created an unreasonable risk to the health
 and safety of the public, we agree with the court of appeals
 that she did not. Therefore, we affirm that the City's
 governmental immunity has not been waived under the
 "dangerous condition" provision of the CGIA.

 JUSTICE MÁRQUEZ, joined by JUSTICE GABRIEL and JUSTICE
 SAMOUR, dissented.

 ¶32
 The General Assembly has expressly waived governmental
 immunity for injuries resulting from a "dangerous
 condition" of a sidewalk. § 24-10-106(1)(d)(I),
 C.R.S. (2021). For that waiver to be given a meaningful
 effect, it must apply to conditions as severe as the sidewalk
 deviation at issue here: a nearly imperceptible,
 two-and-a-half-inch vertical deviation that was known to the
 City of Boulder, deemed an unsafe "hazard" under
 its own standards, and was scheduled for repair. I disagree
 with the majority's conclusion that the sidewalk
 deviation here did not, as a matter of law, constitute a
 "dangerous condition" as contemplated by the
 Colorado Governmental Immunity Act ("CGIA").
Because the majority opinion effectively narrows the scope of
 the CGIA's waiver of immunity and creates an unjust
 result under the circumstances of this case, I respectfully
 dissent.

 I.
Factual Background

 ¶33
Joy Maphis was seriously injured when she tripped over a
 deviation in a residential sidewalk a few blocks from a
 commercial area in Boulder, Colorado. She fell, landing on
 her elbows and her face. Her left elbow was broken, and her
 right elbow was shattered. Maphis required sutures to repair
 her lip, and she underwent two surgeries to regain a
 meaningful range of motion in her right

 elbow. At the time of the Trinity hearing in this
 case, Maphis testified that she still could not straighten
 her left arm and was in constant pain.

 ¶34
 The City was aware of the specific sidewalk deviation that
 caused Maphis's fall because workers had identified it
 during a routine inspection a month prior to Maphis's
 injury. Under the City's guidelines, a deviation greater
 than three quarters of an inch is considered a
 "hazard." The City's engineer acknowledged at
 the Trinity hearing that such deviations make the
 sidewalk "unsafe." The two-and-a-half-inch
 deviation here was more than three times that size. City
 workers had marked the sidewalk and scheduled it for repair.
Unfortunately, the City did not complete those repairs until
 two days after Maphis tripped and fell.

 ¶35
 The deviation here was not only serious, but the district
 court also found that it was "largely
 imperceptible." Maphis testified that she could not see
 the deviation because the coloring of the concrete on the
 vertical face of the slab blended in with the coloring of its
 top surface. Photographs of the sidewalk admitted into
 evidence at the Trinity hearing confirmed her
 testimony. Although the City had identified the deviation and
 scheduled it for repair, it did not mark the area (with
 orange paint or cones, for example) to make the hazard more
 visible to pedestrians.

 II.
The Sidewalk Deviation Constituted a "Dangerous
 Condition"

 ¶36
 The CGIA expressly waives a public entity's immunity from
 suit in an action seeking compensation for injuries resulting
 from a "dangerous condition" of any public sidewalk
 within the corporate limits of a municipality. §
 24-10-106(1)(d)(I). The CGIA defines a "dangerous
 condition" as

a physical condition of a facility or the use thereof that
 constitutes an unreasonable risk to the health or safety of
 the public, which is known to exist or which in the exercise
 of reasonable care should have been known to exist and which
 condition is proximately caused by the negligent act or
 omission of the public entity or public employee in
 constructing or maintaining such facility.

§ 24-10-103(1.3), C.R.S. (2021).

 ¶37
 To establish a "dangerous condition"-and thus, a
 waiver of immunity under section 24-10-106(1)(d)(I)-a
plaintiff must show that her injury resulted from (1) the
 physical condition of a facility or the use thereof; (2)
 which constituted an unreasonable risk to the health or
 safety of the public; (3) which was known to exist or should
 have been known to exist in the exercise of reasonable care;
 and (4) which was proximately caused by the negligent act or
 omission of the public entity in constructing or maintaining
 the facility. Medina v. State, 35 P.3d 443, 454
(Colo. 2001); see also St. Vrain Valley Sch. Dist. RE-1J
 v. Loveland, 2017 CO 54, ¶ 16, 395 P.3d 751, 755.
Here, there is no dispute that Maphis's injuries resulted
 from the physical condition of the sidewalk; that the City
 knew about this specific

 sidewalk deviation; and that the condition of the sidewalk
 was a result of the City's failure to maintain it. The
 only dispute is whether the condition of the sidewalk
 constituted "an unreasonable risk to the health or
 safety of the public." § 24-10-103(1.3).

 ¶38
 To prove that a condition poses an "unreasonable
 risk," the plaintiff must show that the condition
 "created a chance of injury, damage, or loss which
 exceeded the bounds of reason." City & Cty. of
 Denver v. Dennis, 2018 CO 37, ¶ 23, 418 P.3d 489,
 497. Although I agree with the majority that the ultimate
 determination of whether the City has waived its governmental
 immunity is a question of law reviewed de novo, maj. op.
 ¶ 16, the determination of whether a particular
 condition presents an unreasonable risk "will
 necessarily be a fact-specific inquiry."
Dennis, ¶ 23, 418 P.3d at 497.

 ¶39
 The facts here show that Maphis carried her burden of
 establishing that the sidewalk deviation presented an
 unreasonable risk. The two-and-a-half-inch vertical deviation
 that caused Maphis to trip was more than three times the size
 of a deviation the City itself considered to render a
 sidewalk unsafe. While not every deviation exceeding the
 City's three-quarter-inch standard automatically
 constitutes a dangerous condition, the deviation here far
 exceeded what the City itself deemed to require repair given
 the risk of injury it created. Moreover, the City had
 actually flagged and scheduled this particular sidewalk
 deviation for

 repair. In addition, the deviation here was also largely
 imperceptible, even during daylight hours, because the
 coloring of the slab's vertical plane matched the
 slab's top surface-yet the City did not visibly mark the
 deviation or otherwise take action to reduce pedestrians'
 risk of injury while repairs were pending.[1] In short, the
 known hazard in this case created a chance of injury that
 exceeded the bounds of reason.

 ¶40
 Our reasoning in Dennis actually supports the trial
 court's conclusion here. We held in Dennis that
 the deteriorated condition of the road there carried
 "some risk," but that the risk was not
 unreasonable. Id. at ¶ 25, 418 P.3d at 497. In
 reaching that conclusion, however, we pointed to the absence
 of certain factors that are clearly present in this case.

 ¶41
 First, there was conflicting testimony in Dennis as
 to whether the condition of the road caused the collision (by
 preventing the motorcycle from stopping quickly enough to
 avoid the car that had turned in front of it). Id.
 at ¶ 24, 418 P.3d at 497. In other words, there were
 unresolved questions regarding whether the deteriorated road
 condition played a role in causing the accident. Id.
Here, there

 is no such question. The vertical deviation in the sidewalk
 clearly caused Maphis to trip and fall, resulting in her
 serious injuries.

 ¶42
 Second, in Dennis, the city's pavement engineer
 testified that he had inspected the road at that intersection
 a week before the accident and determined that it did not
 require immediate repair. Id. at ¶ 25, 418 P.3d
 at 498. Moreover, although the intersection was rated as
 "very poor" under the city's internal analysis,
 the city's rating system was "not related to how
 safe or dangerous a road is" but served only to assist
 the city in determining maintenance needs and priorities.
Id. at ¶ 5, 418 P.3d at 493. Here, by contrast,
 the City had identified and scheduled this sidewalk deviation
 for repair (and completed those repairs, albeit two days
 after Maphis's accident). In addition, the City's
 engineer acknowledged that under the City's standards, a
 sidewalk deviation greater than three quarters of an inch is
 considered a hazard that makes the sidewalk
 "unsafe."

 ¶43
 Third, we emphasized in Dennis that the road, while
 cracked and rutted, did not contain potholes or sinkholes
 "or any other road characteristics such as a raised
 pavement lip that could damage a vehicle and lead to an
 accident." Id. at ¶ 26, 418 P.3d at 498
(emphasis added). For this reason, we concluded that although
 the road was deteriorated, it was not a road on which it was
 unreasonably risky to drive. Id. Yet the vertical
 sidewalk deviation here presented the very type of hazard to
 a pedestrian that was missing from the facts evaluated in
 Dennis.

 ¶44
 In sum, the analysis in Dennis should lead us to
 affirm the district court's conclusion here that the
 sidewalk deviation was a "dangerous condition" for
 purposes of the CGIA. In holding otherwise, the majority
 misapplies Dennis.

 ¶45
 The majority concedes that "there certainly could be
 instances where a two- and-a-half-inch sidewalk deviation
 would constitute a dangerous condition"
 sufficient to waive immunity. Maj. op. ¶ 28. However,
 the majority apparently would limit such circumstances to
 "high foot-traffic area[s]," "area[s] of
 heightened public safety concern," and sidewalk
 conditions that citizens have frequently reported.
Id. Although such circumstances are certainly
 relevant to determining whether a sidewalk deviation
 constitutes a dangerous condition, they cannot serve to
 restrict the CGIA's waiver of immunity. See
 Dennis, ¶ 14, 418 P.3d at 495 ("Because the
 CGIA derogates common law, we construe its waivers of
 immunity broadly.").

 ¶46
 I fear the majority's ruling today effectively precludes
 any tort claim against a municipality for the dangerous
 condition of a sidewalk-even a known hazardous condition that
 poses an unreasonable risk of injury-unless the condition
 occurs in a "high foot-traffic area" or "an
 area of heightened public safety concern." Nothing in
 the CGIA suggests that we must construe the waiver of
 immunity for the dangerous condition of a public sidewalk so
 narrowly. A known, physical condition capable of causing the
 serious injuries sustained here

 cannot be deemed within the bounds of reason simply
 because it was located in an area of the city with lighter
 pedestrian traffic. As the facts of this case demonstrate,
 tripping over a sidewalk deviation (regardless of its
 location within a municipality) can result in serious,
 long-term injuries. True, the CGIA is aimed, in part, at
 preventing unlimited liability of the government, but its
 waivers of sovereign immunity are intended to allow
 individuals to seek redress for injuries caused by the
 government. Indeed, this is "one of the basic but often
 overlooked" purposes of the CGIA. Daniel v. City of
 Colo. Springs, 2014 CO 34, ¶ 13, 327 P.3d 891, 895
(quoting State v. Moldovan, 842 P.2d 220, 222 (Colo.
1992)). In my view, today's ruling overlooks that
 purpose.

 III.
Conclusion

 ¶47
 A finding that immunity has been waived does not mean that
 Maphis wins; it means only that she may bring her case to
 trial, where she would still have to prove the City's
 negligence to prevail. But the majority's opinion today
 precludes her from even having that opportunity.

 ¶48
 The CGIA clearly waives immunity for claims seeking
 compensation for injuries resulting from the dangerous
 condition of a public sidewalk. Because I believe Maphis
 established that the sidewalk deviation here constituted a
 "dangerous condition" sufficient to establish the
 waiver of immunity under section 24-10-106(1)(d)(I), I
 respectfully dissent.

---------

Notes:

[1] We granted certiorari to review the
 following issues:

1. Whether the court of appeals erred by reviewing the
 trial court's findings of fact for clear error and its
 legal conclusion-that the sidewalk did not constitute such a
 dangerous condition as to waive Boulder's immunity-de
 novo.

2. Whether the court of appeals erred by holding that
 the sidewalk did not constitute a dangerous condition for
 purposes of waiving Boulder's immunity pursuant to the
 Colorado [Governmental] Immunity Act, section
 24-10-106(1)(d)(1), C.R.S. (2020).

[2] Maphis also brought a negligence per
 se claim against a private party, Moreland Family LTD
 Partnership, for failure to maintain the sidewalk adjacent to
 their property pursuant to Boulder Municipal Code §
 8-2-6. That claim is not at issue on appeal.

[3] The City might have done well to more
 clearly mark this deviation while it was awaiting repair.
However, "[n]egligent failure to warn" does not
 "trigger[] a waiver of immunity under the CGIA."
Medina v. State, 35 P.3d 443, 449 (Colo.
2001).

[1] While I acknowledge that a claim under
 the CGIA cannot be predicated solely on a failure to warn,
 see Medina, 35 P.3d at 449, the failure to call
 attention to the hazard here, particularly given how
 difficult it was to perceive, is relevant to determining
 whether it was unreasonably dangerous.

---------