23CA1810 Sigalla v Meidhof 02-06-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1810
City and County of Denver District Court No. 22CV31883
Honorable Andrew J. Luxen, Judge

---

Fiona Sigalla,

Plaintiff-Appellant,

v.

Robin Z. Meidhof and Paul Kyed,

Defendants-Appellees,

and

Colorado Department of Regulatory Agencies' Public Utilities Commission,

Intervenor-Appellee.

---

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE KUHN
Welling and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 6, 2025

---

Robert McGuire Law Firm, Robert A. McGuire III, Denver, Colorado, for
Plaintiff-Appellant

Hall & Evans L.L.C., Andrew D. Ringel, Kendra K. Smith, Denver, Colorado, for
Defendants-Appellees

Littler Mendelson, P.C., Margaret Parnell Hogan, Matthew C. Freemann, Billie
Jo M. Risheim, Denver, Colorado, for Intervenor-Appellee

¶ 1     Plaintiff, Fiona Sigalla, appeals the trial court's dismissal of her claims for defamation and interference with contract or prospective economic advantage against defendants Robin Z. Meidhof and Paul Kyed.  We affirm.

## I.     Background

¶ 2     Sigalla is a senior economist on the trial staff of the Colorado Public Utilities Commission (PUC).  The PUC conducts contested in-house adjudicatory proceedings to address matters involving Colorado utilities.  During these proceedings, the PUC trial staff — consisting of a variety of experts, including economists, analysts, and engineers — are represented by attorneys with the Colorado Department of Law, which is headed by the Colorado Attorney General (collectively the AG's office).  Meidhof and Kyed are two such attorneys.  At the time of the critical events in this case, Meidhof was the Deputy Attorney General over the Revenue and Utilities Section.  Kyed, in turn, was the First Assistant Attorney General of the PUC Litigation Unit, which is one of the units within Meidhof's section.  Meidhof was Kyed's direct supervisor.  Kyed and the attorneys he supervises represent the trial staff during the PUC's adjudicatory proceedings.

¶ 3     During the course of this representation, the PUC Litigation Unit works closely with the PUC trial staff; however, they are two distinct government entities. Lawyers within the AG's office ultimately report to the Attorney General, while the PUC is housed within the Department of Regulatory Agencies (DORA), and its staff ultimately report to the Governor. Unlike a traditional attorney-client relationship, the AG's office — barring unusual circumstances not presented here — is statutorily required to represent the PUC. § 24-31-101(1)(a), C.R.S. 2024.

¶ 4     Meidhof and Kyed received multiple complaints from attorneys in the PUC Litigation Unit regarding Sigalla's workplace behavior in connection with their representation of the trial staff. One assistant attorney general reported extensive concerns about her experiences with Sigalla and her belief that Sigalla's supervisors were not taking any action to rectify the situation. Kyed described the working environment created by Sigalla as "sometimes unprofessional, sometimes inappropriate, sometimes abusive, slash, bullying." However, he noted that "there were some situations where everything was okay working with her," but those situations "were far outweighed by the bad ones." Both sides agree that tensions

2

between Sigalla and the PUC Litigation Unit had simmered for nearly a decade before coming to a head in the events giving rise to this case.

¶ 5     Meidhof and Kyed — along with their predecessors — raised concerns about Sigalla with her supervisors multiple times. But according to them, those reports resulted in no changes to the situation. So after receiving the latest complaints described above, Meidhof conducted an inquiry into Sigalla's behavior and the history of the conflict. She spent several months getting information from other attorneys at the AG's office and speaking with her predecessor deputies of the section, Eric Meyer and Terry Gill. Meyer provided her with two emails from 2017 and 2018 detailing his attempts to engage PUC management about the same issues. Gill also told her about what he had done in 2020 and his communications with the PUC regarding Sigalla. Finally, Meyer, who was then the Chief Operating Officer, advised Meidhof to involve human resources.

¶ 6     Meidhof continued to have discussions with attorneys in the AG's office. Ultimately, with the guidance of human resources, she determined the best course of action was to write a letter to Sigalla's

managers. Meidhof and Kyed drafted the initial letter before sending it to multiple internal reviewers. Meidhof then sent the final letter to the PUC.

¶ 7     The letter detailed the history of complaints from the AG's office, the office's opinions regarding Sigalla's unprofessional behavior, the impact it had had on the AG's office, and the actions the AG's office planned to take regarding Sigalla. These actions included (1) PUC Litigation Unit members no longer communicating with Sigalla; (2) unit members reporting any communication from Sigalla to Kyed, who would determine a response; and (3) unit members no longer attending any meetings in which Sigalla would be present. In addition, the letter detailed a series of steps that the AG's office wanted the PUC to take in order to effectuate those actions. In effect, the letter informed the PUC that the AG's office was cutting off contact with Sigalla.

¶ 8     Upon receipt of the letter, the PUC retained an outside firm to conduct an employment investigation. The investigator, who is also an attorney, completed seventeen interviews of various parties who had been involved in the situation and then issued an investigative report. Notably, Sigalla's reputation within the PUC didn't line up

4

with the experiences expressed in the letter. Sigalla had received strong performance reviews from her supervisors and was seen as a good team member and colleague at the PUC. The investigation resulted in no discipline for Sigalla.

¶ 9 Sigalla then sued Meidhof and Kyed in their individual capacities for defamation and interference with contract or prospective economic advantage. Meidhof and Kyed moved for dismissal under the Colorado Governmental Immunity Act (CGIA), sections 24-10-101 to -120, C.R.S. 2024, and requested a hearing under *Trinity Broadcasting of Denver, Inc. v. City of Westminster*, 848 P.2d 916 (Colo. 1993), to establish facts relevant to their immunity defense.

¶ 10 Before the hearing commenced, the PUC filed an emergency motion to intervene on the grounds that the parties, primarily Sigalla, intended to introduce attorney-client privileged material. The trial court granted the emergency motion and held a hearing on the PUC's claims of attorney-client privilege. The trial court then held the *Trinity* hearing. At the conclusion of that hearing, it issued an oral ruling in favor of Meidhof and Kyed and dismissed the case.

## II.    Analysis

¶ 11    Sigalla contends that the trial court erred by (1) failing to explicitly determine whether Meidhof and Kyed were acting within the scope of their employment, or reaching the wrong conclusion to the extent it impliedly made the determination; (2) finding that Meidhof and Kyed did not act willfully and wantonly; and (3) erroneously excluding evidence and attorney-client privileged material.

### A.    Standard of Review and Applicable Law

¶ 12    The trial court is the finder of fact on questions of sovereign immunity. *Gallagher v. Bd. of Trs. for Univ. of N. Colo.*, 54 P.3d 386, 395 (Colo. 2002), *overruled on other grounds by Martinez v. Est. of Bleck*, 2016 CO 58. We review the trial court's factual findings for clear error. *Bresciani v. Haragan*, 968 P.2d 153, 159 (Colo. App. 1998). "A court's finding of fact is clearly erroneous if there is no support for it in the record." *Gagne v. Gagne*, 2019 COA 42, ¶ 17. However, "[o]nce the questions of fact are resolved, we review questions of governmental immunity de novo." *City & Cnty. of Denver v. Dennis*, 2018 CO 37, ¶ 12. Likewise, "[q]uestions of law

concerning the application and construction of statutes are subject to de novo review." *Danko v. Conyers*, 2018 COA 14, ¶ 19.

¶ 13     "[W]e grant considerable deference to the trial court's determinations and review evidentiary rulings for an abuse of discretion.  A trial court abuses its discretion if its decision is 'manifestly unreasonable, arbitrary, or unfair.'"  *Davis v. People*, 2013 CO 57, ¶ 13 (first citing *Dale v. Guar. Nat'l Ins. Co.*, 948 P.2d 545, 556 (Colo. 1997); then quoting *Freedom Colo. Info., Inc. v. El Paso Cnty. Sheriff's Dep't*, 196 P.3d 892, 899 (Colo. 2008)).  However, "we review de novo [the] application of the attorney-client privilege."  *In re Estate of Rabin*, 2020 CO 77, ¶ 16 (citations omitted).

¶ 14     "The court at every stage of the proceeding must disregard all errors and defects that do not affect any party's substantial rights."  *Stockdale v. Ellsworth*, 2017 CO 109, ¶ 32 (quoting C.R.C.P. 61).  "[A]n error affects a substantial right only if 'it can be said with fair assurance that the error substantially influenced the outcome of the case or impaired the basic fairness of the trial itself.'"  *Laura A. Newman, LLC v. Roberts*, 2016 CO 9, ¶ 24 (emphasis omitted) (quoting *Bly v. Story*, 241 P.3d 529, 535 (Colo. 2010)).  The party

7

asserting error has the burden to show that any error was harmful or prejudicial.  *See Poudre Valley Rural Elec. Ass'n v. City of Loveland,* 807 P.2d 547, 557 (Colo. 1991).

¶ 15    The CGIA extends sovereign immunity to public employees — subject to certain exceptions not applicable here — for "any claim for injury . . . , which lies in tort or could lie in tort." § 24-10-118(2)(a).  However, the immunity only applies when a claim "arises out of an act or omission of such employee occurring during the performance of [the employee's] duties and within the scope of [the employee's] employment unless the act or omission causing such injury was willful and wanton."  *Id.*

¶ 16    "The statute 'requires that a plaintiff set forth in [the] complaint specific facts which support [the] claim that public employees acted willfully and wantonly'; conclusory allegations are insufficient."  *Wilson v. Meyer,* 126 P.3d 276, 282 (Colo. App. 2005) (quoting *Robinson v. City & Cnty. of Denver,* 39 F. Supp. 2d 1257, 1264 (D. Colo. 1999)).  And because governmental immunity under the CGIA derogates Colorado's common law, we strictly construe the statute's immunity provisions, but we broadly construe its

8

waivers of immunity. *Springer v. City & Cnty. of Denver*, 13 P.3d 794, 798 (Colo. 2000).

## B.    Scope of Employment

¶ 17    Sigalla first contends that the trial court reversibly erred when it did not explicitly determine whether Meidhof and Kyed acted within the scope of their employment. Additionally, she argues that Meidhof's and Kyed's actions were outside the scope of their employment. We address each argument in turn.

### 1.    The Trial Court Impliedly Found That Meidhof's and Kyed's Actions Were Within the Scope of Their Employment

¶ 18    As an initial matter, we agree with Sigalla that the trial court did not expressly determine whether Meidhof's and Kyed's actions were within the scope of their employment. We also agree that this question must be determined to resolve a claim of sovereign immunity. *See Gallagher*, 54 P.3d at 394. However, under the specific factual circumstances of this case, we disagree that the lack of an express finding requires reversal.

¶ 19    Citing *Gallagher*, *Martinez*, and *Dennis*, Sigalla argues that "[t]he Colorado Supreme Court has consistently reversed and remanded sovereign-immunity decisions in which trial courts have

9

failed to make the requisite factual findings needed to support a determination as to all the elements of immunity." But those cases are distinguishable on the facts from the case before us, in which the trial court made the requisite factual findings to support its conclusion.

¶ 20    In *Gallagher*, the supreme court addressed a CGIA immunity claim under a different jurisdictional framework than courts currently employ. At the time, an assertion that a public employee acted willfully and wantonly was a matter of qualified immunity, not sovereign immunity.[1] And "the trial court [could] not decide the [qualified immunity] issue on a C.R.C.P. 12(b)(1) motion to dismiss for lack of subject matter jurisdiction." 54 P.3d at 394. The trial court in *Gallagher*, however, had not held an evidentiary hearing on

---

[1] Qualified immunity and sovereign immunity are distinct legal doctrines that provide different forms of protection for public officials and entities. "Qualified immunity applies to a public official's conduct when [the official] takes a discretionary action that a reasonable person would not know violates a clearly established constitutional right of the plaintiff." *Churchill v. Univ. of Colo.*, 2012 CO 54, ¶ 39. In contrast, sovereign immunity under the CGIA protects a public entity, and its employees, from being sued in tort without consent. It acts as a jurisdictional bar to any action that falls within its scope. *See* §§ 24-10-108, -118(2)(a), C.R.S. 2024; *see also Martinez v. Est. of Bleck*, 2016 CO 58, ¶ 15.

whether the defendant's actions were within the scope of his employment. And its order was unclear as to how it reached its conclusion on that question of sovereign immunity. As a result, the supreme court remanded for an evidentiary hearing and further findings. *See id.* at 395.

¶ 21 *Martinez* abrogated *Gallagher*'s distinction between scope of employment being a sovereign immunity question but willful and wanton conduct implicating qualified immunity. The court held that "trial courts must resolve all issues pertaining to sovereign immunity prior to trial, including factual issues, regardless of whether those issues pertain to jurisdiction." *Martinez*, ¶ 27. The supreme court noted that this "may require the trial court to hold an evidentiary, or '*Trinity*,' hearing in order to determine whether immunity applies." *Id.* Further, it noted that "*Trinity* and its progeny govern claims of public employee sovereign immunity as well." *Id.* The supreme court concluded that a trial court must resolve the question whether the defendant's conduct was willful or wanton as part of its sovereign immunity determination. *Id.* at ¶ 28. Because the district court in *Martinez* had only relied on the

11

allegations in the complaint, the supreme court remanded the case to resolve the factual questions. *Id.*

¶ 22    In *Dennis*, the supreme court reinforced this point from *Trinity* and *Martinez.* It held that "[b]ecause the CGIA protects the government from suit, the district court must necessarily make factual findings to ensure that the court has jurisdiction to hear the case." *Dennis*, ¶ 10 (citing *Trinity*, 848 P.2d at 924.)

¶ 23    Unlike these cases, however, the trial court in the case before us did hold an evidentiary hearing, made factual findings, and issued an ultimate determination on whether Meidhof and Kyed were covered by sovereign immunity. These factual findings — quite unlike the procedural posture of *Gallagher* or *Martinez* — enable us to discern why the trial court made its ultimate determination.

¶ 24    In its oral ruling, the trial court properly set out the requirements of section 24-10-118. And it correctly noted that for the CGIA to apply, "the public employee has to have been performing his or her duties within the scope of their employment" and if the public employee was acting within the scope of their

12

employment, that Sigalla "bears the burden of demonstrating that the official's conduct was willful and . . . wanton."

¶ 25    Before the trial court reached the question of willful and wanton conduct, it made the following factual findings:

- The letter "does not reach outside of arguably the Attorney General's purview and the purview of Deputy, then a Deputy Attorney General Meidhof to indicate how it is her subordinates and her unit would behave with respect to Ms. Sigalla."

- "[T]he evidence supports the inference that [Meidhof and Kyed] sent the letter to try and mitigate tension and difficulties in their workplace for their employees."

- "The intent behind the letter of July 9th, 2021 was to protect [Meidhof and Kyed's] employees, not to harm [Sigalla]."

¶ 26    It's true that the trial court didn't follow these findings up with a final explicit finding that Meidhof and Kyed were acting within the scope of their employment.  And it undoubtedly would have been the better practice for the court to have made the express finding.  But its oral ruling nonetheless reflects that it articulated the correct

question and then made a number of findings about how Meidhof and Kyed were acting within the scope of their responsibilities with regard to employees under their supervision. Under these circumstances, we conclude that the trial court implicitly found that Meidhof and Kyed were acting within the scope of their employment.[2]

¶ 27 Having reached this conclusion, we turn to whether this finding is in error.

### 2. Meidhof's and Kyed's Actions Were Within the Scope of Their Employment

¶ 28 Sigalla contends that even if the trial court found that Meidhof's and Kyed's actions were within the scope of their employment, such a determination was in error.

¶ 29 The CGIA grants immunity to public employees from injuries "which occurred or [are] alleged in the complaint to have occurred

---

[2] Sigalla argues that these findings were directed toward the willful and wanton prong of the sovereign immunity question rather than the scope of employment. This doesn't undercut our conclusion. Given the overall structure of the court's oral ruling, we conclude that these facts also support its determination regarding the scope of employment.

during the performance of [their] duties and within the scope of [their] employment." § 24-10-118(1).

¶ 30     Sigalla invites us to use a specific test for attorneys to determine whether their actions fall within the scope of their employment. She argues that "for a lawyer's conduct to fall within the scope of his employment, that conduct must be not only on-the-job conduct, but also conduct that is within the scope of appropriate professional conduct for a lawyer."[3]  In essence, she asks us to engraft a professional conduct requirement onto the statute.  We decline this invitation.

¶ 31     First, the legislature has carved out specific employment-based exceptions under the CGIA.  *See* § 24-10-106(1)(i), C.R.S. 2024 (waiving CGIA protections for peace officers who destroy lawful recordings of their activities under section 13-21-128, C.R.S. 2024).  But it did not do so for attorneys, or, indeed, for other professions governed by ethical rules or codes

---

[3] We note that Sigalla's government entity employer is the organizational client of the AG's office, not Sigalla herself.  *See generally* Colo. RPC 1.13; § 24-31-101(1)(a), C.R.S. 2024.  This undercuts her assertion that Meidhof and Kyed owed her a duty under the Rules of Professional Conduct.

15

of conduct. "'Where the legislature could have chosen to restrict the application of a statute, but chose not to, we do not read additional restrictions into the statute.' 'And we will not second-guess the policy preferences of the legislature.'"[4] *Roane v. Archuleta*, 2022 COA 143, ¶ 50 (first quoting *Springer*, 13 P.3d at 804; then quoting *Prairie Mountain Publ'g Co. v. Regents of Univ. of Colo.*, 2021 COA 26, ¶ 25), *aff'd*, 2024 CO 74.

¶ 32    Second, we disagree with Sigalla that an action taken in violation of a rule of professional conduct automatically means that the action was taken outside the scope of a person's employment. While an ethical breach might be a proper consideration in evaluating that question, it is not determinative.

¶ 33    Instead, under the CGIA, "[a]n act of an employee is within the scope of his employment if the work done is assigned to him by his employer, is necessarily incidental to that work, or is customary in the employer's business." *Podboy v. Fraternal Ord. of Police*, 94

---

[4] Sigalla generally suggests that to construe the phrase "within the scope of employment," we should refer to the statute's legislative history. But then she fails to point us to any. We therefore don't consider this argument further. *See Woodbridge Condo. Ass'n v. Lo Viento Blanco, LLC*, 2020 COA 34, ¶ 41 n.12 ("We don't consider undeveloped and unsupported arguments."), *aff'd*, 2021 CO 56.

16

P.3d 1226, 1230 (Colo. App. 2004). The record reveals that Meidhof and Kyed drafted the letter at their workplace with input from the department's chief operating officer, chief deputy, and director of human resources. Moreover, Meidhof and Kyed were supervisors. They drafted the letter in response to complaints made to them from employees under their supervision. And it is clearly within a supervisor's employment duties to address the concerns of the employees whom they supervise.

¶ 34 Sigalla nonetheless argues that Meidhof and Kyed overstepped their authority and acted outside of the scope of their employment by "impos[ing] discipline against Sigalla." But the record refutes this contention. In making its oral ruling, the court found that "the letter does not call for the firing of Ms. Sigalla. It does not . . . call for a reassignment of Ms. Sigalla by the [PUC]. It does not call for specific discipline to be imposed on Ms. Sigalla by the [PUC]."

¶ 35 Likewise, we see no indication — in the letter or otherwise — that Meidhof or Kyed "imposed discipline" against Sigalla. The trial court's findings are amply supported by the record, including testimony from multiple witnesses and the contents of the letter

17

itself.  Indeed, the court found Meidhof's and Kyed's testimony on this point credible.

¶ 36     Given the record support for the court's factual findings, we conclude that they aren't clearly erroneous.  *See Gagne,* ¶ 17.  And its factual findings support its implied intermediary finding that Meidhof and Kyed acted within the scope of their employment. Thus, we discern no error in the trial court's scope of employment ruling.

## C.     Willful and Wanton Conduct

¶ 37     Sigalla next contends that the trial court erred in finding that Meidhof and Kyed did not act in a willful and wanton manner.  She argues that the trial court, in conducting its willful and wanton analysis, impermissibly (1) required that they be aware that their letter would cause her harm and (2) concluded that evidence of their good faith motivation was relevant in the assessment of whether Meidhof and Kyed engaged in willful and wanton conduct.

¶ 38     Under *Martinez,* "willful and wanton conduct is not merely negligent; instead, it must exhibit a conscious disregard for the danger."  *Martinez,* ¶ 32.  Reviewing the trial court's application of law de novo, *see Danko,* ¶ 19, we conclude that the trial court

18

considered appropriate factors when applying the "conscious disregard" standard set forth in *Martinez*.

### 1. The Court Did Not Err by Considering Meidhof's and Kyed's Knowledge

¶ 39    First, Sigalla argues that there is no requirement that Meidhof and Kyed knew how their letter would harm her before the court could find their conduct was willful and wanton. She relies on *Duke v. Gunnison County Sheriff's Office*, 2019 COA 170, ¶ 37, in support of this argument. She points to a statement of a division of this court in that case noting that there is "no support for the proposition that a public employee's knowledge of the specific cause of potential injury or death is required for the employee's omissions to constitute willful and wanton conduct. To the contrary, knowledge and conscious disregard of a health danger to another is sufficient." *Id.* Then she highlights the trial court's statement that "[Sigalla] has not presented evidence showing that [Meidhof and Kyed] were aware that their conduct would cause her harm," arguing that it runs afoul of the standard articulated in *Duke*.

¶ 40    As an initial matter, *Duke* dealt with physical and medical harm, not defamation as the case before us does. Regardless, *Duke*

could not and did not change the standard articulated by the supreme court in *Martinez.* To the contrary, the *Duke* division held that while a party may not need to have knowledge of the specific cause of a medical condition, the *knowledge and conscious disregard* of the health danger qualified as willful and wanton conduct. *Duke,* ¶ 38.

¶ 41     The trial court neither misstated nor misapplied the law. When it said that Sigalla had not presented evidence that Meidhof and Kyed were aware that their conduct would cause her harm, that is but another way of saying that she did not prove that they consciously disregarded a danger to her. This analysis complies with the standard for determining whether their conduct was willful and wanton as set forth in *Martinez* and as applied in *Duke.*

### 2.     The Court Did Not Err by Considering Meidhof's and Kyed's Motivations

¶ 42     Second, Sigalla argues that Meidhof's and Kyed's intent is irrelevant to the question of whether their conduct exhibited a conscious disregard for danger. Thus, she argues that the trial court's finding that Meidhof and Kyed had good faith motivations was erroneous. We disagree. While good intent might not

necessarily mean that conduct was not willful and wanton, it is one factor that a trial court may consider. *See Martinez*, ¶¶ 30-31 (observing that, while no single definition applies for willful and wanton conduct, a conscious disregard for danger may encompass conduct "purposefully committed, which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to the consequences, or of the rights and safety of others, particularly the plaintiff" (emphasis omitted) (quoting *Moody v. Ungerer*, 885 P.2d 200, 205 (Colo. 1994))); *Wilson*, 126 P.3d at 282 ("[T]o satisfy the CGIA, a plaintiff claiming defamation must show not only wanton indifference to the falsity of a statement, but intent or reckless disregard of the injury that the statement causes." (citing *Zerr v. Johnson*, 894 F. Supp. 372, 376 (D. Colo. 1995))).

¶ 43     Besides, an actor's intent may indicate knowledge and awareness, which in turn sheds light on whether that actor exhibited a "conscious disregard." We perceive no error in the trial court examining Meidhof's and Kyed's intent while evaluating whether their conduct was willful and wanton within the meaning of the CGIA. And Sigalla does not challenge the trial court's underlying finding — that she failed to demonstrate conduct

showing a conscious disregard of danger — upon which that conclusion stands.

¶ 44    Thus, we discern no error in the trial court's finding that Meidhof's and Kyed's actions were not willful and wanton.

### D.    Attorney-Client Privilege Rulings

¶ 45    Sigalla contends that the (1) PUC's attorney-client privilege was inconsistently asserted and enforced to her disadvantage, resulting in a waiver of that privilege; and (2) the PUC also waived that privilege by asserting a claim or defense in the matter.  We address each in turn.

#### 1.    The Trial Court Didn't Err in its Rulings About the PUC's Attorney-Client Privileged Materials

¶ 46    Sigalla claims the PUC only objected when she sought to elicit privileged testimony from witnesses but didn't make similar objections when Meidhof or Kyed sought to do the same.  She claims that this pattern harmed her case and waived the PUC's privilege over the underlying communications.  She also claims that the trial court failed to uniformly apply and enforce the privilege.

¶ 47    Sigalla claims that this pattern occurred in six areas: (1) an exhibit about audits versus discovery and an exhibit showing a

recorded meeting between trial staff and lawyers; (2) testimony about Sigalla taking overly aggressive settlement positions; (3) testimony about the recorded meeting; (4) testimony by former PUC director Doug Dean; (5) testimony about whether a lawyer from the AG's office limited Sigalla's expert testimony; and (6) the investigative report "exonerating Sigalla," which had been "declared privileged" by DORA (which again houses the PUC).

¶ 48 Before turning to the merits of this issue, we must address the PUC's argument that Sigalla has failed to provide citations to the record to support her argument.

### a. Sigalla's Unsupported Arguments

¶ 49 The PUC asserts that "[Sigalla] does not provide this Court any citation to where PUC raised no objections when [Meidhof or Kyed], instead of Sigalla, introduced testimony and evidence about these same events, interactions, or topics." The PUC is partially correct.

¶ 50 For the first five of the topic areas listed above, Sigalla does not provide record support for her broad assertion of a comparative lack of objections about the same privileged materials when raised by Meidhof and Kyed. In its answer brief, the PUC pointed out this lack of record citations. But in her reply brief, Sigalla did not cure

23

the problem. Instead, she pointed again to references where the PUC objected to her counsel's questions. She then again broadly stated that the "PUC's counsel did not object when Kyed and Meidhof introduced evidence about the first five of those parenthetical matters during their part of the Trinity hearing."

¶ 51 Despite this assertion, Sigalla never provides record citations to support this argument. We are thus left without direction to what portion of the record demonstrates that the PUC didn't object to — and the trial court didn't appropriately manage — Meidhof's and Kyed's attempts to elicit similarly privileged material.

¶ 52 It is the appellant's obligation to support their argument by identifying the "parts of the record on which [they] rely." C.A.R. 28(a)(7)(B). And "it is not the duty of the reviewing court to search the record for evidence to support bald assertions." *Brighton Sch. Dist. 27J v. Transamerica Premier Ins. Co.*, 923 P.2d 328, 335 (Colo. App. 1996), *aff'd*, 940 P.2d 348 (Colo. 1997); *see also Black v. Black*, 2018 COA 7, ¶ 67 ("'[J]udges are not like pigs, hunting for truffles buried in' the parties' submissions." (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991))). Thus, we decline to review these unsupported assertions further.

### b.    The Investigative Report

¶ 53    We reach the opposite conclusion regarding Sigalla's sixth example.  She claims that the PUC inconsistently asserted its privilege by allowing Meidhof and Kyed to introduce witness statements collected during the investigation that resulted in the investigative report but then objected to her attempts to introduce the investigative report itself.  She asserts this resulted in the PUC waiving its privilege.

¶ 54    As a general matter,

> [t]he attorney-client privilege is waived if the client, the client's lawyer, or another authorized agent of the client: . . . (3) in a proceeding before a tribunal, fails to object properly to an attempt by another person to give or exact testimony or other evidence of a privileged communication.

Restatement (Third) of the Law Governing Lawyers § 78 (Am. L. Inst. 2000).  To protect attorney-client communications, "[r]easonable efforts must be exerted to maintain the secrecy of confidential communications, including making timely objection[s] . . . to their

25

disclosure." *Id.* at cmt. e.  The parties agree that the PUC is the client and is the attorney-client privilege holder.[5]

¶ 55     Sigalla is correct in her broad assertion that "[w]aiver by failing to make proper objection is an application of the general rule requiring parties to object contemporaneously to inadmissible evidence."  *Id.*; *see Dep't of Health v. Donahue*, 690 P.2d 243, 247 (Colo. 1984) ("Waiver is the intentional relinquishment of a known right or privilege.").  Waiver of the privilege "may be explicit, as when a party orally or in writing abandons an existing right or privilege; or it may be implied, as, for example, when a party engages in conduct which manifests an intent to relinquish the right or privilege, or acts inconsistently with its assertion." *Donahue*, 690 P.2d at 247.

¶ 56     Sigalla argues that this principle applies here because the PUC "allowed Meidhof and Kyed to introduce 134 pages of witness statements" from the investigative report.  But then, Sigalla asserts,

---

[5] "Only the client, the holder of the attorney-client privilege, may waive it.  But such a waiver may be express or implied." *People v. Cortes-Gonzalez*, 2022 CO 14, ¶ 27 (citing *Rademacher v. Greschler*, 2020 CO 4, ¶ 23).

26

the PUC selectively enforced its privilege with regard to the investigative report itself.[6]

¶ 57    As Meidhof's and Kyed's counsel was cross-examining Dean, the PUC's director at the time, she informed the trial court that the report had been declared privileged by DORA.[7]  After making this representation, Meidhof's and Kyed's counsel continued to question Dean, who had not read the investigative report.  No questions were asked implicating the privileged content of the report itself.

¶ 58    We don't see how this series of events supports the conclusion that the PUC waived its privilege.  It's true that there were no objections in this section of the transcript.  But the questions appear to be wholly congruent with the PUC's protection of its privilege.  Meidhof's and Kyed's counsel asserted that the report

---

[6] To the extent she challenges the trial court's management of this evidence, it's notable that Sigalla stipulated to the admission of the investigative report's witness statements.  The trial court can hardly be said to have erred by admitting the evidence to which she had stipulated with no other objections.

[7] Sigalla does not contest the report's privileged status, and we note the trial court found that it was privileged after an in-camera review.

had been declared privileged and then didn't inquire about the privileged material.

¶ 59    This example doesn't support Sigalla's argument that the PUC selectively objected or that the trial court impermissibly enforced the PUC's privilege against her.[8]  We see no potential exposure of privileged material during Dean's examination requiring a PUC objection for consistency.  And to the contrary, later in the hearing, when Meidhof's and Kyed's counsel attempted to question a witness about the contents of the investigative report — and the statements used in its creation — *the PUC objected.*

¶ 60    The PUC points us to another example of its consistent objections involving the surreptitiously recorded meeting between the PUC trial staff and the AG's office.  The trial court declared the video privileged after reviewing it in camera before the *Trinity* hearing.  Sigalla questioned Meidhof, who had not reviewed the video, about her testimony that "Sigalla referenced [her] competency and called [her] an idiot in four different ways."  The PUC did not

---

[8] We note that Sigalla does not contend that the trial court erred in declaring the investigative report privileged material, nor does she contend that the materials declared attorney-client privileged in this case are not in fact privileged.

directly object to this line of questioning; however, it noted the following:

> Your Honor, . . . just for the record, Your Honor, I'm not objecting to any of the questions, but I would note to the Court [the video exhibit] is [the exhibit] that the Court yesterday excluded.  So to the extent that there's going to be . . . further representations about what occurred during that meeting I think that that is a potential issue for the Court to address.

Sigalla's counsel responded, "Your Honor, I certainly won't refer to any attorney-client privileged information from that meeting.  I'll simply refer to the things that we've already talked about, Ms. Sigalla's behavior."  The court allowed questioning to continue.

¶ 61    Then, during Kyed's cross-examination, Sigalla's counsel asked the following questions:

> [Sigalla]: Have you seen the video of the . . . Zoom meeting where a complaint was made that Ms. Sigalla said you were idiots or words to that effect?  Did you see a video of that meeting that was produced in this case?
>
> [Kyed]: I watched the video which has been marked for identification as [the video exhibit].
>
> [Sigalla]: And you would agree with me that Ms. Sigalla said nothing of the kind that indicated that you were idiots or worse to that effect.  Isn't that true?

¶ 62　The PUC immediately raised the following objection:

> Asking questions about the specifics discussed in that meeting, I believe go into the attorney client privilege.  Ms. Meidhof wasn't able to answer questions about that video today because she hadn't watched it.  She only could comment that she was disturbed that it had been recorded without . . . her permission . . . or knowledge.  I don't see a way for there to be specific questions asked about this video without going into privilege.

¶ 63　This example does show the PUC consistently making reasonable efforts to protect its privilege in an equal manner.  *See* Restatement (Third) of the Law Governing Lawyers § 78.  When Meidhof, who had not seen the privileged and barred video exhibit, talked about her interactions with Sigalla, the PUC did not object, instead noting that the questioning was treading close to privileged material.  But when Sigalla's counsel later asked a direct question about the content of a privileged meeting, the PUC objected.

¶ 64　Our review of the record shows that the examinations largely followed this pattern.  When a party approached privileged territory, the PUC's counsel raised a concern.  But when a party attempted to delve into the privileged material itself, the PUC objected.  We see no waiver of the attorney-client privilege by the PUC under these

circumstances. *See Donahue*, 690 P.2d at 247. And given these facts — particularly in the absence of citation to particular rulings — we see no unequal enforcement of that privilege by the court.

¶ 65    Thus, we do not see an abuse of discretion in the trial court's rulings on objections to privileged material.

### 2.    The PUC Didn't Waive Its Privilege by Asserting a Claim or Defense

¶ 66    Sigalla also appears to contend that the PUC impliedly waived its privilege through intervening in the case as a party. In support, she cites *Rademacher v. Greschler*, 2020 CO 4, ¶ 24, for the proposition that "assertion of a 'defense that depends on privileged information' effectuates an implied waiver of the privilege."

¶ 67    But the record reflects that the PUC intervened in this matter solely to enforce its privilege. It did not assert a claim or defense, nor did it join in any other party's claims or defenses. We thus see no support for the premise underlying Sigalla's argument and the principle articulated in *Rademacher*. Her contention therefore fails.

### E.    Exclusion of Evidence

¶ 68    Sigalla also contends that the trial court (1) impermissibly excluded some of her witnesses; (2) allowed hearsay statements

31

from two of those excluded witnesses; and (3) stopped her from introducing a video exhibit. We address each contention in turn.

¶ 69 First, the trial court excluded three witnesses that Sigalla intended to call: Frances Koncilja, Marianne Ramos, and Sharon Podein — a former commissioner and a former and current PUC employee. The trial court excluded these witnesses after Sigalla inadvertently omitted them from her witness list.

¶ 70 "The purpose of such pre-trial disclosure of witnesses is to enable all parties to prepare for trial." *In re Estate of Gardner*, 505 P.2d 50, 52 (Colo. App. 1972). Both C.R.C.P. 16(f)(3)(VI)(A) and the trial court's pretrial order require the parties to list who they will call as witnesses at trial. And "[u]nder C.R.C.P. 16 wide discretion is vested in the trial court to determine whether a witness who has not been listed on the pre-trial order and whose name has not been disclosed to the opposing party may testify." *Gardner*, 505 P.2d at 52. The record shows that the court ordered the parties to disclose witnesses that would be called ten days before the *Trinity* hearing. And it reiterated that point when the parties had to move the hearing.

¶ 71     Sigalla argues that the trial court was wrong to exclude Koncilja because Sigalla could have made an offer of proof as to the relevance of Koncilja's testimony.  She also argues that there was no surprise regarding Koncilja's testimony because Meidhof and Kyed had deposed her earlier in the litigation.  And she argues that the court should have permitted Ramos and Podein to testify live because it admitted their witness statements, as discussed below.

¶ 72     But even if all of those arguments are true, they don't demonstrate that the trial court's decision to exclude Koncilja as a witness was manifestly unreasonable, arbitrary, or unfair.  *See Sovde v. Scott*, 2017 COA 90, ¶ 24.  The trial court has broad discretion to manage the proceeding in front of it (and to hold parties to its pre-hearing orders).  The fact that some considerations — such as surprise or preparation — didn't favor exclusion don't automatically render the court's decision manifestly unfair.  We discern no abuse of discretion under these circumstances.

¶ 73     Second, Sigalla argues that it was improper for the trial court to admit the hearsay statements of her next two excluded witnesses, Ramos and Podein, but to bar them from testifying live because they had been omitted from the witness list.  However, as

she admits, she stipulated that these witnesses' hearsay statements could be admitted into evidence. As part of that stipulation, Meidhof and Kyed agreed to let Dean, the PUC's director, testify after he was also left off Sigalla's witness list. So Sigalla attempts to appeal the admission of hearsay evidence that she explicitly agreed could be put before the court in exchange for other testimony she wanted, which would have been excluded in the absence of the parties' stipulation. We conclude that Sigalla intentionally relinquished her right to object to the admission of the hearsay witness statements. *See Donahue*, 690 P.2d at 247. Thus, this issue is waived, and we decline to review it further. *See People v. Geisick*, 2016 COA 113, ¶ 16.

¶ 74    Third, Sigalla argues that the district court erroneously barred her from introducing the video exhibit that she, admittedly, surreptitiously recorded of the meeting between the PUC and the AG's office. She planned to introduce the video exhibit to rebut Meidhof's testimony that Sigalla called her "an idiot in four different ways."

¶ 75    As detailed above, the court had already reviewed the video exhibit in camera and determined that it was privileged and could

not be introduced at the *Trinity* hearing. So instead of introducing the video exhibit itself, Sigalla's counsel asked Meidhof and Kyed questions about the exhibit. The first part of that exchange is detailed above in Part II.D.1.b. After Kyed acknowledged reviewing the video exhibit, the following exchange occurred:

> [Sigalla]: And you would agree with me that Ms. Sigalla said nothing of the kind that indicated that you were idiots or worse to that effect. Isn't that true?
>
> [PUC]: Objection. The Court has struck [the video exhibit] from this hearing.
>
> [Sigalla]: [The video exhibit] was struck because it had attorney client privilege information in it. I'm asking a question about his memory of the video. That doesn't involve any kind of attorney client privilege.

¶ 76 We disagree with Sigalla's characterization of this exchange. The trial court had previously barred the video exhibit, in its entirety, as privileged. Despite Sigalla's attempts to characterize her questioning as "something that was not discussed during the meeting," her argument is belied by the plain language of the questioning, which implicated the contents of the meeting. The trial court's exclusion of questions about material that it already ruled was privileged does not constitute an abuse of its discretion.

35

¶ 77    Thus, we discern no error in the trial court's evidentiary rulings.

## III.    Disposition

¶ 78    The judgment is affirmed.

JUDGE WELLING and JUDGE SCHUTZ concur.